835 A.2d 215

**B&S MARKETING ENTERPRISES, LLC.,**

v.

**CONSUMER PROTECTION DIVISION.**

No. 1672 Sept.Term 2002.

Court of Special Appeals of Maryland.

Nov. 4, 2003.

132

**136**

Lawrence P. Fletcher–Hill (Gordon, Feinblatt, Rothman, Hoffberger & Hollander, L.L.C. on the brief), Baltimore, for appellant.

William D. Gruhn, Assistant Attorney General (Lauren R. Calia, Assistant Attorney General, J. Joseph Curran, Jr., Attorney General on the brief), Baltimore, for appellee.

Argued before SALMON, EYLER, JAMES R., and KRAUSER, JJ.

KRAUSER, Judge.

The appellants are B&S Marketing Enterprises, LLC, and S&B Marketing Enterprises, LLC and the two men, who operate and control these two entities, Louis R. Seo, Jr. and Frank A. Brown, Jr.[1] Using the trade names "Kash–2–U leasing" and "Cash–2–U leasing," B&S and S&B Enterprises provide "quick cash" to Maryland consumers through a contractual contrivance appellants call a "sale-leaseback" but which might more aptly be described, under the circumstances in which it was typically presented and enforced, as a "sale-leaseback-repurchase" agreement.

It is the last stage of this transaction—the "repurchase"—which, according to the Consumer Protection Division of the

---

1. Seo is the president of B&S and S&B and owns 75% of the stock of both companies. Brown is the vice-president of B&S and S&B and owns 25% of the stock of both companies.

Office of the Attorney General ("Division"), transformed what might have passed as a "sale-leaseback" into an unambiguous "loan." What were dubbed "rental payments" by appellants were deemed "interest payments" by the Division. And those payments were paid, according to the Division, at the exorbitant annual interest rate of 730%.

In due course, the Division brought charges against the appellants, alleging that they had made unlicensed and usurious "loans" in violation of Maryland's Consumer Loan Law, Md.Code (2000 Repl.Vol., 2003 Supp.), §§ 12–301 to–317 of the Commercial Law Article ("CL"), and had, by misrepresenting these "loans" as "sale-leasebacks", engaged in "unfair or deceptive trade practices" in violation of the Maryland Consumer Protection Act, CL §§ 13–101 to 501. This matter was then referred to an administrative law judge for a hearing ("ALJ").

At the conclusion of that hearing, the ALJ found that the "sale-leaseback" was not a "loan," that appellants, individual and corporate, had in any event engaged in unfair and deceptive sales practices in violation of the Consumer Protection Act, and that Seo and Brown were personally liable for those practices. She therefore recommended that all charges pertaining to the Consumer Loan Law be dismissed but that appellants be ordered to cease and desist from violating the Consumer Protection Act and to pay restitution to "consumers for renewal and repurchase transactions, during the period of February 1994 through February 1996." Her recommendation stopped short, however, of requesting the imposition of civil penalties.

Although it adopted most of the ALJ's recommendations and all of her factual findings that were based upon her determination of witness credibility,[2] the Division reached a different conclusion as to whether the "sale-leaseback" was a loan and as to whether civil penalties should be imposed. In

---

**2.** "To the extent that the ALJ credited or did not credit the testimony of witnesses who testified in person about specific events," it would "defer," the Division declared, "to the judgment of the ALJ, who had the opportunity to hear and observe those witnesses."

its Final Decision, the Division declared that appellant had "enter[ed] into loans in the form of a pretended sale-leaseback ... without complying with the Consumer Loan Law." The Division's ensuing Final Order required that appellants make certain disclosures, "cease and desist from violation of the Consumer Protection Act, take affirmative action in the form of restitution, and pay civil monetary penalties."

Challenging the conclusions reached by the Division, appellants filed a petition for judicial review in the Circuit Court for Baltimore City. That was followed by the Division's issuance of an Amended Final Order. In that order, the Division, as it did in its original order, required appellants to "cease and desist from the violation of the Consumer Protection Act," "take affirmation action in the form of restitution," and pay "civil monetary penalties" as well.

Affirming the Division's decision, the circuit court remanded "the case to the agency to issue an order that makes explicit that simply changing forms will not make the pretend leaseback valid." From that order, appellants noted this appeal, presenting the following issues for our review: [3]

 I. Did the Division apply the correct legal standard to appellant's sale-leaseback transactions?

 II. Did the Division err in finding that the disclosures made by appellants in connection with the sale-leaseback transactions were insufficient?

 III. Did the circuit court exceed its authority in remanding the matter to the Division for revision of the Amended Final Order?

 IV. Did the Division exceed its authority in ordering "individual awards of restitution without any showing of reliance?"

 V. Did the Division err in not giving deference to the ALJ's finding that Seo and Brown acted in good faith and in imposing personal liability on them?

---

3. To facilitate our review of the issues raised by appellants, we have reworded and consolidated them.

For the reasons that follow, we shall affirm the judgment of the circuit court.

### The Sale–Leaseback

Using radio and television advertisements, appellants targeted employed persons between the ages of 25 and 39, "in the $20,000–or–so income bracket," needing "cash rather quickly," for their sale-leaseback program. The advertisements declared that anyone needing emergency cash could "get up to $200 today" by calling "752–C–A–S H." To qualify for the money, the potential customer was informed that he or she must have "an active checking account," "own electronics or appliances," and "have been on [his or her] job for one year." The text of one radio advertisement stated:

MONEY PROBLEMS GETTING YOU DOWN? ? ?

NO MONEY TO PAY THE ELECTRIC BILL? ? ?—**NO PROBLEM**

NO MONEY TO PAY THE TELEPHONE BILL? ? ?—**NO PROBLEM**

NO MONEY TO COVER THE CHECK YOU JUST WROTE? ? ?—**NO PROBLEM**

THESE AND ANY OTHER EMERGENCIES CAN BE SOLVED WITH A SIMPLE PHONE CALL TO KASH–2–U LEASING. CALL 752–2274, THAT'S 752–C–A–S H AND GET UP TO $200.00 TODAY. WITH KASH–2–U LEASING EMERGENCY MONEY PROBLEMS ARE A THING OF THE PAST. GET MONEY FOR BACK TO SCHOOL ITEMS, FALL SALES AND LATE VACATIONS BY CALLING KASH–2–U LEASING AT 752–2274, THAT'S 752–C–A–S–H. IF YOU HAVE AN ACTIVE CHECKING ACCOUNT, OWN ELECTRONICS OR APPLIANCES AND HAVE BEEN ON YOUR JOB FOR ONE YEAR, KASH–2–U CAN PROBABLY QUALIFY YOU FOR THEIR SALE/LEASEBACK PROGRAM RIGHT OVER THE PHONE. THERE'S NO CREDIT CHECK AND NO RED TAPE AND YOU CAN HAVE THE $200.00 IN YOUR POCKET TODAY—YES, I SAID TODAY. THAT NUMBER AGAIN FOR FAST, FAST

CASH TODAY. CALL KASH–2–U LEASING AT 752–2274, THAT'S 752–C–A–S–H. CALL CASH FOR CASH.

Another radio advertisement declared:

IT'S THAT TIME AGAIN! OUT WITH THE OLD YEAR AND IN WITH THE NEW! AND ALL THE MANAGE-MENT AND EMPLOYEES OF CASH–2–U LEASING WOULD LIKE TO TAKE THIS OPPORTUNITY TO SINCERELY THANK ALL OF OUR WASHINGTON CUSTOMERS FOR A GOOD AND REWARDING 1994. AND REMEMBER, MONEY EMERGENCIES NEED NOT RUIN YOUR HOLIDAY CELEBRATION. CALL CASH–2–U LEASING NORTH AT (301)949–2274, THAT'S 949–C–A–S–H OR SOUTH AT (301)702–2274, THAT'S 702–C–A–S–H AND GET UP TO $200.00 TODAY. NO CRED-IT CHECK AND NO RED TAPE. JUST HAVE AN ACTIVE CHECKING ACCOUNT, BE ON YOUR JOB ONE YEAR, ANSWER YES TO A COUPLE OF QUES-TIONS AND COME PICK UP $200.00 TODAY. FAST, FAST CASH! THAT'S THE CASH–2–U WAY. LET CASH–2–U GET YOU IN THE PARTY MOOD. MAKE 1994 A YEAR TO REMEMBER AND START 1995 ON A HAPPY NOTE. CALL CASH–2–U NORTH AT 949–2274, THAT'S 949–C–A–S–H OR SOUTH AT 702–2274, THAT'S 702–C–A–S–H AND LET U.S. HELP YOU HAVE A HAP-PY, HAPPY NEW YEAR.

Indeed, according to the Division, "[a]dvertising run by [appellants] shortly before the hearing stated that they [were] 'not a loan company, pawn, or check cashing service' but still did not offer an explanation as to what the consumer transaction would be." (Footnote omitted). When a consumer re-sponded to one of these ads by telephoning appellants, he was told that he could obtain up to $200 if he brought with him to one of appellants' two stores his checkbook, bank statement, photo identification, pay stub, phone bill, and serial numbers for two household items to qualify for the "sale-leaseback" program. Upon arrival, the consumer submitted these docu-ments, filled out an application, and "sold" one or two appli-ances to appellants for $100 each. Appellants then leased the

appliances back to the consumer for fifteen day terms at $30 per appliance. Typically, the lease ended when all rent was paid up-to-date and the appliances were repurchased.

Appellants paid the same price for each appliance, $100, regardless of the nature, condition, or actual value of the item. At no time did appellants see, appraise, inspect, or even verify the existence or ownership of an appliance, beyond requesting its serial number from the consumer. Many items purchased by appellants had a market value that was far less than the $100 purchase price. In short, the amount of the purchase price was not related to the fair market value of the specific item being purchased. The sales portion of this two-part transaction was oral until June 1995, when appellants added a "Bill of Sale" form, containing a description of the property, serial numbers, and sometimes model numbers.[4]

After the sale of the appliance to appellants, the consumer signed a "Lease Agreement for Personal Property," requiring the customer to pay appellants as rent the sum of $30 per item at 15 day intervals. Just as the purchase price was unrelated to the fair market value of the item being purchased by appellants, the amount of the rent was not related to the actual fair market rental value of the item being rented.

The lease agreement further provided for the repurchase of the rental property "at the end of the initial lease term or at the end of any renewal for a cash price equal to the fair market value of the rental property," provided that all other fees were paid. Although the lease granted the consumer the right to terminate the agreement "at any time following the expiration of the initial lease term or any renewal" by re-turning the property and paying all accrued charges, the green option sheet given to customers at the time they signed

---

4. In May of 1995, appellants were informed by the Commissioner of Consumer Credit that their transaction was a "loan" because they did not bear the risk of loss, repairs, or maintenance of the rental property and they had not taken possession of it. As a result, appellants, as the ALJ observed, "added a written Bill of Sale to the transaction process and revised the lease agreement to the effect that the lessor bore the risk for repairs or replacement upon notice by the lessee."

the lease, which was in larger print than the lease agreement, set forth only three termination options. None of the options stated that the lease agreement could be terminated by surrendering the rental property.

The options sheet was used by appellants from February 1994 through at least March 1996. It presented the options in the following words and format:

### Options For The Sales–Leaseback Program
Options For The Sales-Leaseback Program

AT THE END OF YOUR FIRST 15 DAY CYCLE YOU HAVE 3 OPTIONS AVAILABLE TO YOU. THE OPTIONS ARE AS FOLLOWS:

OPTION # 1 — CASH OUT [5] — YOU ARE NOW OUT OF THE PROGRAM.

| $ 60.00 | RENT |
| $200.00 | PURCHASE PRICE |
| $ 10.00 | TAX |
| $270.00 | |

OPTION # 2 — BUYDOWN — YOU ARE BUYING YOUR ITEMS BACK 1 AT A TIME.

| $ 60.00 | RENT |
| $100.00 | PURCHASE PRICE |
| $ 5.00 | TAX |
| $165.00 | |

YOU HAVE NOW PURCHASED 1 ITEM OUT OF THE PROGRAM AND NOW HAVE AN ADDITIONAL 15 DAYS TO PURCHASE ITEM 2 BACK.

| $ 30.00 | RENT |
| $100.00 | PURCHASE PRICE |
| $ 5.00 | TAX |
| $135.00 | |

OPTION # 3 — RENTAL PAYMENT — WHEN USING OPTION # 3 THE RENT DOES NOT APPLY TO THE PURCHASE PRICE. ALL THAT OPTION # 3 DOES IS GRANT YOU AN ADDITIONAL 15 DAYS TIME IN WHICH TO PURCHASE YOUR ITEMS BACK.

| $ 60.00 | RENT |

As noted, no mention was made in the green options sheet of the right of the customer to terminate the lease by surren-

---

5. A later version of the green options sheet changed "cash out" to "repurchase" and made minor changes in the calculations.

dering the property. Nor was that option discussed with potential customers. In fact, employees of appellants were instructed by appellants' training manual to stress that the customer was obligated to repurchase the rental property to terminate the transaction.[6]

In March 1996, however, appellants replaced the green options sheet with a "yellow multi-part options sheet," adding the missing fourth option. That option read:

**OPTION # 4**—RETURN OF MERCHANDISE—WHEN USING OPTION # 4 YOU PAY THE $60.00 RENTAL AND RETURN THE RENTAL MERCHANDISE. ONCE YOU HAVE MADE THE RENTAL PAYMENT AND RETURNED THE RENTAL MERCHANDISE YOU HAVE NO FURTHER OBLIGATION TO US.

But "repeat" customers were never told of this revision, and they comprised 80% of appellants' monthly business.

When a customer fell behind on his or her payments, appellants began collection activities by telephoning the customer. During such calls, appellants demanded payment, but, not surrender of the property. Collection calls were followed by a demand letter in which appellants advised the customer: "Failure to contact us will leave us no choice but to use all means necessary to collect this amount." Like the collection calls, such letters never mentioned that the property could be returned.

If that produced no results, appellants deposited the security deposit check of the delinquent customer, deeming that check to be a "repurchase" of that customer's property. If a check was dishonored, appellants sent the customer a "Notice of Returned Check." That notice, among other things, advised the customer that passing a bad check was a crime and specified the criminal penalty for that crime, by setting out at length the relevant criminal statute. It concluded by inform-

---

**6.** The training manual was revised in 1997 to require employees to explain to customers that they had the option of returning the rental property to terminate the transaction.

ing the customer in large capitalized letters: "IF YOU FAIL TO HONOR YOUR CHECK WITHIN 10 DAYS AFTER RECEIVING THIS NOTICE, WE WILL BE FORCED TO CONSIDER APPROPRIATE LEGAL ACTION." What appellants did not attempt to do, however, was repossess the property.

The Division concluded that "[m]any customers found it difficult to come up with the $270 (purchase price for two items plus rent for two items plus tax for two items) needed to pay off their obligation to the [appellants]" and that "[s]uch customers continued paying the 'rent' until they could come up with the full 'repurchase' price." Those customers, the Division observed, "often paid rent that was many times the value of the property that they were 'renting.' " The Division cited as examples a customer who paid $1,153 in rent for one item, and others who paid $682, $600, and $503, respectively, in rent for two items. "The annual interest rate on such a loan," the Division noted, was "730%."

Despite the lease agreement's property surrender provision, the Division found that "[t]he vast majority of customers—approximately 99.5%—eventually paid back the money which they had received from [appellants]." Indeed, the Division found that appellants "designed their transaction to ensure that consumers ultimately repaid the cash advanced by the [appellants] rather than surrender the property listed in the transactional documents." When defaulting customers did surrender the property to appellants, appellants "refused to do business with them in the future" and the surrendered items "were treated as being of zero or negligible residual value and abandoned," the Division stated. In fact, so inconsequential was this property considered by appellants that they did not list the thousands of items of rental property they purchased in the course of conducting their business on the Maryland personal property return forms they filed with the Department of Assessments and Taxation.

From the inception of their business in 1994 through 1996, appellants, the Division found, had entered into sale-leaseback

agreements with more than 11,000 customers. Many of those transactions were personally handled by Brown and Seo. By the date of the administrative hearing, appellants had entered into a total of 56,208 sale-leaseback transactions, but the "leased" property had been surrendered in only 84 instances.[7]

### Procedural History

On August 8, 1996, the Division filed a Statement of Charges and Petition for Hearing with the Chief of the Consumer Protection Division. That statement named as respondents, B&S Marketing Enterprises, Inc., doing business as Kash–2–U Leasing, and later S&B Marketing Enterprises, Inc., doing business as Cash–2–U Leasing, and its two officers and stockholders, Louis R. Seo, Jr., and Frank A. Brown, Jr. In that statement, Division claimed that appellants, among other things, "provide small loans to consumers in the principal amount of $200, for which they charge an interest rate of 780% per annum," [8] and that "[i]n order to avoid Maryland's usury and consumer finance laws, which would require the maker of such loans to be licensed and to charge no more than 33% interest per annum, [appellants] have created a sham 'sale-leaseback' transaction." The statement further averred that consumers "who have cash emergencies are induced to enter into these sham transactions in order to obtain short term credit at usurious interest rates" and that appellants misrepresented and concealed "the true nature, terms and legality of these transactions."

The Division recommended that appellants be ordered "to cease and desist from violation of the Consumer Protection Act and of the Consumer Loan Law," to pay restitution "of money received from consumers in connection with a violation

---

7. From July 1994 through September 1996, S&B engaged in a total of 38,810 transactions resulting in 44 transactions in which customers surrendered goods. From October 1994 through September 1996, B&S engaged in a total of 17,398 transactions resulting in 40 transactions in which consumers surrendered goods.

8. The Division, however, found that "the annual interest rate on such a loan [was] approximately 730%."

of the Consumer Protection Act," to "pay $1000 civil penalties per violation," and "to pay for the costs of the investigation and th[e] proceeding."

The Chief of the Consumer Protection Division granted the Division's petition for a hearing and referred the matter to the Office of Administrative Hearings for a public hearing.

Following a public hearing, the presiding ALJ, in a written decision, found that appellants' transaction was a sale-lease-back transaction, not a loan, but nonetheless concluded that appellants, in presenting the sale-leaseback program, engaged in unfair and deceptive trade practices in violation of the Consumer Protection Act. In reaching that conclusion, the ALJ noted, among other things, that, from February 4, 1994 through March 1996, appellants "used several option sheets which explained three options for repurchasing goods, but did not include an option for returning the goods." The option sheet, the ALJ explained, though "not a transactional document," misrepresented "the terms of the lease with respect to how a customer could close the transaction."

The ALJ further found that, based on the very low number of items returned by consumers, "many, if not most, consumers believed that they were obligated to purchase the leased goods." She pointed out that, from July 1994 through September 1996, appellants "had 56,208 transactions of property, yet only 44 [9] items were returned by their customers."

The ALJ recommended that the Consumer Protection Division issue an order requiring that appellants: "cease and desist from violation of the Consumer Protection Act," pay "restitution of money received from consumers for renewal and repurchase transactions, during the period of February 1994 through February 1996, which violated the Consumer Protection Act," and "pay for the costs of the investigation and this proceeding." She did not, however, order appellants "to

---

9. This number represents items returned to S&B Marketing Enterprises, Inc., but not the 40 items returned to B&S Marketing Enterprises, Inc.

pay civil penalties for the above violations." She further recommended that the "Consumer Protection Division dismiss the charges ... alleging violations of the Consumer Loan Law."

On November 19, 1997, the parties filed exceptions to the ALJ's decision with the Division. After hearing argument on those exceptions, the Division issued a "Final Decision" on November 2, 2001.[10] In that decision, the Division found that appellants had "engaged in small loan transactions in the form of sale-leaseback and resale transactions" and were not licensed to do so under the Consumer Loan Law. It further found that the "effective annual rate of interest in a typical transaction-in which the customer paid 'rent' equaling 30% of the principal every 15 days-was approximately 730%." That rate, it stated, exceeded the limits set forth in Consumer Loan Law. It also found that appellants had not provided the consumer disclosures required by that law.

With respect to "unfair or deceptive trade practices," the Division found that appellants had "presented [their] transaction as a sale-leaseback in form, but in practice [had] engaged in loan transactions," and that they had "led consumers to believe that [appellants] could lawfully enter into a species of loan transactions with a rate of interest far in excess of that permitted by law." "Even if the transaction were construed as a sale-leaseback," the Division opined, appellants "misled consumers by omission at critical junctures as to whether the transaction could be terminated other than by repayment of the funds advanced."

With respect to the green option sheet's omission of the option to surrender the property, the Division concluded that

[t]he omission of the option to surrender property in the versions of the options sheet used during most of the period at issue and [appellants] emphasis on "repurchase" options

---

10. The decision was the work of Robert N. McDonald, Chief Counsel of Opinions & Advice, for the Office of the Attorney General, who had been delegated final decision-making authority by the the Chief of the Consumer Protection Division.

in that document and in other practices demonstrates their intent to mislead consumers as to the formal terms of the lease form. This was apparently done so that consumers would repay the money received rather than present [appellants] with property that [appellants] would otherwise abandon.

(Citation omitted).

The Division further stated that because "Seo and Brown individually participated in the unfair and deceptive practices, they are personally liable for any penalties assessed or restitution which may be ordered." It assessed a civil penalty "in the amount of $100 per transaction—or a total $591,400." That penalty was based on 5,914 transactions that occurred during the period from September 1995 to February 1996.

On November 2, 2001, the Division issued a "Final Order." That order required appellants to "cease and desist from violation of the Consumer Protection Act, take affirmative action in the form of restitution, and pay civil monetary penalties, as well as the costs of this proceeding." It further ordered appellants to "cease and desist from lending money to consumers until" they obtained a "license from the Commissioner of Financial Regulation under the Maryland Consumer Loan Law," revised their "communications with consumers to explicitly represent the transaction as a loan," and ceased "charging a higher rate of interest than allowed by the Maryland Consumer Loan Law."

Paragraph 3 of the Final Order stated:

3. *Relief Relating to Sale–Leaseback Program.* Alternatively, if Respondents wish to continue their operations as a sale-leaseback program involving consumer property, Respondents shall cease and desist offering a sale-leaseback program unless and until they are in compliance with the following provisions:

Those "following provisions" required in part that appellants make "clear and conspicuous" disclosures, as well as provide customers with a disclosure statement, a new options sheet, and a disclosure form of "Comparative Cost of Sale–Lease-

back." The "clear and conspicuous" disclosure requirement provided that appellants "shall truthfully and affirmatively disclose to consumers all material facts about the nature of the sale-leaseback transaction and the consumer's options and obligations under the transaction."

The disclosure statement that was to be placed in appellants' advertisements was to read "substantially as follows":

*We will pay you $ [insert range of prices offered] to buy _____ items of your personal property. You keep that property and pay us rent.*

*You will owe us $ [insert rental amount and term] for the time that you keep that property.*

*You have two options to get out of the sale-leaseback: (1) turn the property over to us and owe us nothing more or (2) buy back the property from us.*

And finally, the disclosure statement was required to compare the cost of a sale-leaseback to a loan. It was to read:

### The Cost of a Sale Leaseback Compared to a Loan

*In this sale-leaseback, you will receive $ _____ to sell _____ items of property, and then pay $ _____ rent every 15 days.*

*The cost to you of renting this property for a year is 730% of the money you will receive.*

*By comparison, if you got the same $ _____ as a loan from a bank or finance company or credit card, the interest you would pay is limited by law to no more than 33% per year.*

After the Final Order was issued, the Division filed a motion to modify it. In that motion, the Division expressed concern that appellants could "argue that compliance with paragraph 3 constitutes full compliance with applicable law, including the Consumer Loan Law." The Division suggested that paragraph 3 be revised to read:

3. Relief Relating to Sale Leaseback Program. [Alternatively,] If Respondents wish to continue operations as a sale-leaseback program involving consumer property, in addition

to complying with all laws that may be applicable, including but not limited to the Consumer Loan Law, Respondents shall cease and desist from offering a sale-lease back program unless and until they are in compliance with the following provisions:

(Strikeout and underlining in original). The Division further proposed deletion of "730" as the percentage in the disclosure form, which compared the cost of a sale-leaseback to a loan, because the "percentage rate would depend upon the amounts in the first paragraph of the disclosure, which are to be filled in by [appellants] based on the actual amounts charged."

On November 29, 2001, prior to a ruling on the motion, appellants filed a petition for judicial review in the Circuit Court for Baltimore City. A day later, on November 30, 2001, an "Amended Final Order" was issued, rejecting the Division's proposed change of paragraph 3 and accepting its proposed change of the disclosure form, by removing "730" as the percentage.

Following a hearing on appellants' petition, the circuit court, in a written opinion, stated that the "transactions are loans and not sales and leasebacks," that "the [Division] did not err in ordering restitution to all those who entered into the unlawful transaction with [appellants]," and that "finding Seo and Brown personally liable [was] not erroneous." The circuit court also found that the amended final order was "not as clear as it should be" and consequently remanded "the case to the agency to issue an order that makes explicit that simply changing forms will not make the pretend leasebacks valid." Later, the circuit court issued an order affirming the final decision of the Division and remanding the case for an order consistent with the court's written opinion.

### Standard of Review

In reviewing a decision of an administrative agency, our role "is precisely the same as that of the circuit court." *Dep't Of Health & Mental Hygiene v. Shrieves,* 100 Md.App. 283, 303–04, 641 A.2d 899 (1994). We review only the decision of the administrative agency itself. *Ahalt v. Montgomery*

*County,* 113 Md.App. 14, 20, 686 A.2d 683 (1996). We "do not evaluate the findings of fact and conclusions of law made by the circuit court." *Consumer Prot. Div. v. Luskin's, Inc.,* 120 Md.App. 1, 22, 706 A.2d 102 (1998), *rev'd in part on other grounds,* 353 Md. 335, 726 A.2d 702 (1999). "Thus, whether the circuit court applied the wrong standard of review is of no consequence if our own review satisfies us that the [Board's] decision was proper." *Giant Food, Inc. v. Dep't of Labor, Licensing & Regulation,* 124 Md.App. 357, 363, 722 A.2d 398 (1999), *rev'd on other grounds,* 356 Md. 180, 738 A.2d 856 (1999). To conduct a proper inquiry of an administrative agency's decision, we " 'must be able to discern from the record the facts found, the law applied, and the relationship between the two.' " *Sweeney v. Montgomery County,* 107 Md.App. 187, 197, 667 A.2d 922 (1995) (quoting *Forman v. Motor Vehicle Admin.,* 332 Md. 201, 221, 630 A.2d 753 (1993)).

In reviewing the decision of an agency, our role "is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *United Parcel Serv., Inc. v. People's Counsel,* 336 Md. 569, 577, 650 A.2d 226 (1994). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Md. State Police v. Warwick Supply & Equip. Co.,* 330 Md. 474, 494, 624 A.2d 1238 (1993) (quoting *State Admin. Bd. of Election Laws v. Billhimer,* 314 Md. 46, 58, 548 A.2d 819 (1988)).

In making this determination, we must give " 'deference ... not only [to the agency's] fact-findings, but to the drawing of inferences from the facts as well.' " *Id.* (quoting *Billhimer,* 314 Md. at 59, 548 A.2d 819). We must also accord deference to the agency's " 'application of law to those [factual findings], if reasonably supported by the administrative record, viewed as a whole.' " *Berkshire Life Ins. Co. v. Md. Ins. Admin.,* 142 Md.App. 628, 653, 791 A.2d 942 (2002) (quoting *Ins. Comm'r v. Engleman,* 345 Md. 402, 411, 692 A.2d 474

(1997)). " 'When, however, the agency's decision is predicated solely on an error of law, no deference is appropriate and the reviewing court may substitute its judgment for that of the agency.'" *Warwick*, 330 Md. at 494, 624 A.2d 1238 (quoting *Billhimer*, 314 Md. at 59, 548 A.2d 819). Thus, if the agency's decision " 'is not predicated solely on an error of law, we will not overturn it if a reasoning mind could reasonably have reached the conclusion reached by the agency.'" *Id.* (quoting *Billhimer*, 314 Md. at 59, 548 A.2d 819).

## Discussion

### I.

Appellants contend that the Division applied the wrong law and the wrong legal standard in concluding that their sale-leaseback transactions were really "loans," not leases. It should have applied, according to appellants, the more "explicit" standards of the Maryland Uniform Commercial Code, Md.Code (1975, 2002 Repl. Vol., 2003 Supp.) §§ 1–101 to 10–112 of the Commercial Law Article ("UCC"), rather than the "pretended purchase" provision of the Consumer Loan Law, which appellants insist "lack[s] any explicit criteria for a 'pretended purchase.'" Had it done so, appellants maintain, the Division would not have considered appellants' intent or purpose, but only the legal terms of the lease agreements and that would have inexorably led to the conclusion that appellants were offering sale-leasebacks and not loans to consumers.

But the issue before us is not which law—the UCC or the Consumer Loan Law—offers the most "explicit standards" for determining what is or is not a loan but rather which law prevails when the two conflict. To answer that question, we need look no further than the provisions of the UCC, which categorically declare that, in such instances, the Consumer Loan Law prevails. *See* UCC §§ 2A–104(2), 9–201(c)(1) (providing that in case of a conflict between a consumer protection statute and either Title 2A, dealing with leases or Title 9, dealing with secured transactions, the consumer protection

statute controls). And that law unquestionably permits the Division to look beneath the formal terms of an agreement and to consider the substance of that agreement in determining whether it constitutes a "loan."

Moreover, unlike appellants, we do not find the Consumer Loan Law is too vague to apply. Maryland's Consumer Loan Law applies to loans having "an original amount or value which does not exceed $6,000." CL § 12–303(a). Thus the "loans" made by appellants, which never exceeded $100 per appliance, were covered by this law. The law further provides that "[a] person may not engage in the business of making loans under this subtitle unless the person is licensed under or is exempt from the licensing requirements of Title 11, Subtitle 2 of the Financial Institutions Article, the Maryland Consumer Loan Law–Licensing Provisions." *Id.* § 12–302. There is no dispute that appellants did not have lending licenses. And finally, the law defines "lender" as "a person who makes a loan under this subtitle," § 12–301(c), and "loan" as "any loan or advance of money or credit made under this subtitle," § 12–301(e).

We turn now to the provision that appellants maintain is too vague for application—the "pretended purchase provision." That provision, CL § 12–303(3)(c), states:

(c) *Pretended purchase of property or of services considered loan.*—This subtitle applies but is not limited to a lender who:

(1) As security for a loan, use, or forebearance of money, goods, or things in action or for any loan, use, or sale of credit, whether or not the transaction is or purports to be made under this subtitle, makes a pretended purchase of property from any person and permits the owner or pledgor to retain possession of the property; or

(2) By any device or pretense of charging for his services or otherwise, seeks to obtain any interest, charges, discount, or like consideration.

The language of CL 12–303(3)(c) is neither new nor novel. It first appeared in Maryland's former Uniform Small Loan

Law.1918 Md. Laws, Chap. 88.[11] The preamble to that law is worth re-stating here. It declared that there had "long been conducted in this State an extensive business, in the making of small loans . . . to persons in need of funds to meet immediate necessities," that the "conduct of such business has long been a cause of general complaint, and of much hardship and injustice to borrowers," and that there was no effective provision "for the protection of such borrowers and for the punishment of usurious lenders."

 Nor did the Division err in looking beneath the form of the transaction at issue, into its "true nature," in determining whether it was a "loan". *See Andrews v. Poe*, 30 Md. 485, 487 (1869). In *Andrews*, the Court of Appeals explained:

It matters not in what part of the transaction it may lurk, or what form it may take—whether it reads six per cent[,] upon its face, with an understanding to pay *an extra four per cent.*, or whether it be a pretended sale and lease, or under whatever guise the lender—always fruitful in expedients—may attempt to evade the law[.] [C]ourts of justice, disregarding the shadow and looking to the substance, will ascertain what in truth was the contract between the parties.

*Id.* at 487–88. The propriety of this approach has been repeatedly reaffirmed. *See, e.g., Hoffman v. Key Fed. Sav. &*

---

11. Section 18 stated in part:

Sec. 18. No person, co-partnership, or corporation, except as authorized by this Act shall, directly or indirectly, charge, contract for, or receive interest or consideration greater than six (6) per centum per annum upon the loan, use or forbearance of money, goods or things in action, or upon the loan, use or sale of credit, of the amount or value of three hundred dollars ($300) or less.

(a) The foregoing prohibition shall apply to any person who, as security for any such loan, use or forbearance of money, goods or things in action or for any such loan, use or sale of credit, makes a pretended purchase of property from any person and permits the owner or pledgor to retain the possession thereof, of who, by any device or pretense of charging for his services, or otherwise, seek to obtain a greater compensation than is authorized by this Act.

*Loan Ass'n,* 286 Md. 28, 34, 416 A.2d 1265 (1979); *Brenner v. Plitt,* 182 Md. 348, 356–57, 34 A.2d 853 (1943).

In looking beneath the form of the transaction, to determine whether the sale-leaseback was in substance a disguised loan, the Division considered "all the circumstances of the transaction." It analyzed appellants' advertising, their oral and written presentation of the transaction to consumers, their customers' understanding of the program, their "valuation and treatment of the property" they purportedly purchased, and their collection practices.

With respect to appellants' advertising, the Division found that appellants "targeted consumers who were in need of cash and who wished to avoid a credit check, presumably because they would have difficulty obtaining a loan." Although those advertisements did not use the word "loan" and, on occasion, referred to a "sale leaseback plan," they provided, the Division observed, "no details and emphasized that the customer would obtain $200 cash immediately without a credit check." Indeed, Seo testified that the advertisements targeted those who were employed, between the ages of 25 and 39, and had a "take home" income of $1,000 per month.

With respect to appellants' training materials, the Division found that "[u]p to the time of the hearing[,] the materials used to train [appellants'] employees stressed only the option for a customer to repay the money received by 'repurchasing' the items of property." The Division pointed out that, until the time of the hearing, "the training manual did not address the possibility that the customer would actually turn the property over to" appellants. In fact, one of appellants' early presentation scripts, written by Seo and Brown, emphasized to the customer: "At the end of the lease term, you have the option to repurchase these items from us." Later, after January 1996, appellants developed a training manual, stating that customers could terminate the transaction by returning the property, but emphasizing the repurchase options. That was done by listing the repurchase and rental payment options before the return property option. Subsequently, in 1997,

during the ALJ hearing, appellants instituted an "office manual," which, unlike the training manual, contained, among other things, a section on handling property returned by the customers. And like the training manual, the office manual deemphasized the return property option by listing it last.

The Division further found that, in explaining the transaction to customers, appellants' "oral representations and options sheet ... did not match the written transactional documents." The Division noted that most of appellants' customers were "not sophisticated in financial transactions," and therefore "looked to [appellants'] employees to explain the transaction." Comparing the language of the original green options sheet—used from February 1994 to March 1996—with that of the lease agreement, the Division stated: "While the lease form contained two legal-sized pages of small print legalese, [the green options sheet] ... was easier to read and in larger print." As the green options sheet only addressed repurchase options, the Division stated, appellants "led customers to believe that they were required ultimately to repay the $200 by 'repurchasing' the items ... listed in the transactional documents." And as we noted earlier, appellants did not include the option to terminate the transaction by returning the property until March 1996, in the "multi-yellow part options sheet." Moreover, repeat customers, comprising 80% of appellants business, testified that they were not told about the revisions to the options sheets.

"Most customers ...," the Division stated, "considered the 'rental merchandise' ... to be collateral that secured their payment obligation," and "understood that, if they defaulted on that obligation, they would be sued or the property would be seized as collateral." For instance, when asked what she understood her agreement with appellants to mean, customer Ruth Lampkin responded: "I gave my Magnavox TV and my Sony CD player like for collateral if I reneged on the repayment of the $270." Customer Pomra Powell gave similar

testimony, stating that she saw her television as collateral for her loan.

The Division further noted that appellants "evinced little interest in th[e] property" they had purportedly purchased and that "[a]part from obtaining a generic description of an item and a serial or model number, they obtained no information about the age, condition, or even location of the item." In fact, as the Division noted, appellants "did not list any of that property in personal property returns that they filed with the State." The Division concluded: "[Appellants'] disinterest in obtaining more information about the items 'purchased' illustrates the actual role played by the items of personal property listed in the transactional documents and demonstrates that the 'purchase' was in fact a pretense."

With respect to the "purchase" price, the Division stated: "According to [appellants'] forms, they always 'purchased' the items of property listed by consumers for $100 per item, regardless of the nature, condition, or actual value of the particular item." What is more, the Division found, appellants "never inspected the property before assigning that price" and "did not even *ask* consumers about the age, condition, or value of the items listed." The Division further stated that the fair market value of the property "ranged from $5 (*e.g.*, toasters and telephones) to as high as $500" and that appellants, "in many transactions, . . . 'purchased' for $100 items that were worth far less." And appellants, the Division pointed out, "always assigned $100 as the price for 'repurchase' of an item by the consumer regardless of depreciation or how many times the item had been listed in the transactions." Thus, "as with a loan," the Division concluded, appellants "were always to be repaid the same amount they had originally advanced to the consumer."

While there was no evidence before the Division that appellants relied on a property appraisal in setting their $100 purchase price, to justify that price, appellants presented appraisals of "approximately 1,727 items shown on approximately 896" lease agreement forms. After categorizing those

items, the appraiser found that the fair market value [12] of the different items ranged from a toaster at $5 to a 32" Color T.V. at $340, and concluded that $90.07 represented the average fair market value. As a result, the Division stated: "It appears that [appellants] routinely paid an average of 11 percent more than the average fair market value of the items identified in their transactional documents."

The Division also noted that "consumer testimony at the hearing confirmed that few of the items listed in the transaction documents ... could be worth $100." For example, customer Sharon Martin testified that the property appellants purportedly from purchased from her, included a ten-year-old Uniden car phone, for which she paid $190, and a five to ten-year-old radio, for which she paid less than $50. Customer Cynthia Peacock stated that she sold to appellants a small black and white television and a 19 inch color television, with a remote, which she valued at $50 each. Joanne Anthony stated that appellants purchased from her for $100 each: a two-year-old microwave, for which she paid $80, and a two-year-old telephone and answering machine. And customer Ruth Lampkin stated that appellants purchased from her a three-year-old 13 inch color TV, for which she paid $299; a twelve-year-old, 20 inch color TV, for which she paid $349; and a twelve-year-old VCR, for which she paid $200. "Given the likely depreciation of the value of some of these items," the Division concluded, "the fair market value of most individual items was less than $100 at the time of the transactions."

The Division further noted that, "[i]f items were substantially less in value than the purchase price stated in the bill of sale, [appellants] conceivably could have suffered a loss if the customer were to terminate the lease by delivering the items

12. The appraisal report defined "fair market value" as:

[T]he highest price estimated, in terms of money, which the property would bring if exposed for sale on the open market by a Seller who is willing but not obliged to sell, allowing a reasonable time to find a Buyer who is willing but not obliged to buy, both parties having full knowledge of all the purposes to which the property is best adapted and capable of being used.

rather than repaying the 'purchase' price." Based on the "formal terms of [appellants'] lease form," the Division asserted, "their practice of 'purchasing' an item without any consideration of the item's value appears to be a foolish practice." It therefore concluded:

[Appellants'] apparent willingness to assign an item a price sometimes far in excess of its appraised value makes sense only if there is an understanding that the sales transaction is to be reversed on the same terms in the future. That is, one cannot consider the 'sale' transaction in isolation for a rational person in [appellants'] position would only enter into such a transaction if a resale were contemplated at the same or a better price.

And it further observed:

[I]f customers had truly understood that there was an option to turn in the listed property in lieu of repaying the $200 advanced, a rational consumer would have listed items of negligible value, collected $200 from [appellants], paid the $60 'rental' fee, and simply surrendered the items to [appellants] at the end of the rental period at a tidy profit. Of course, not all consumers behave as a rational economist might expect. However, the testimony at the hearing confirmed that consumers would have turned in those goods that were worth less than $200 if they had understood that they would be relieved of the obligation to pay back the money advanced by [appellants]. The fact that consumers did not take advantage of [appellants'] apparent generosity confirms the consumer testimony that [appellants] led consumers to believe that they were obligated to repay the $200 by 'repurchasing' the property.

(Citation omitted). The Division also found that "the 'sale' and obligatory 'resale' at the same price without any transfer in possession of the property meant that the only thing that changed hands were funds advanced to, and repaid by, the customer."

With respect to the "rental" payments customers made to appellants, the Division determined that, "[l]ike the 'purchase

price,' the intervening 'rent' payments were unrelated to the actual value of the property listed in the transactional documents." As noted earlier, the lease agreement required that customers pay appellants $30 per item as "rent"—which the Division characterized as "$30 per $100 principal"—at 15 day intervals.

With respect to repayment of the funds advanced to customers, the Division pointed out that,

> [i]f a customer did not have sufficient funds to pay the money advanced on the due date, he or she could continue to pay $30 "rent" with respect to every $100 advanced for successive 15–day terms. Many customers found it difficult to come up with the $270 ordinarily required at the end of the first 15–day period and often paid "rent" many times the value of the property they were "renting."

As one customer testified, "I really got stressed out ... paying $60 and never getting anywhere." Another explained: "It was hard for me to get $270. I was behind already with my bills. And ... the interest part I could pay but I just couldn't pay the $270." The Division concluded that if customers "had known of an option to surrender property rather than repay the funds advanced, they would have done so.... [C]ustomers whose goods were worth less than $100 also would have surrendered the property, if they understood it was an option." That conclusion was further bolstered by the testimony of customers Sharon Martin, Cynthia Peacock, and Joanne Anthony. Martin was asked, "If anybody had told you you could turn in your car phone and radio and not have to pay the $200 back, would you have?" She responded, "Yes, I would have turned it in." Peacock gave similar testimony:

Q. Did the person at Cash–2–U tell you anything about your being able to bring the TVs in and their forgiving the $200?

A. No, that was never mentioned.

Q. If someone had offered to take the TVs off your hands for $200, what would your response have been?

A. Being honest, I would have to tell them that the TVs—
if I could have gotten $50 for both of them, it would
have been good.

And Joanne Anthony testified:

Q. Did anyone at Kash–2–U say, "Ms. Anthony, if you
don't want that microwave, you just bring it-bring it in
and we'll forgive $100"?

A. No, no.

Q. What was your understanding of what you were sup-
posed to do when you left Kash 2 U?

A. Come back with the money.

Q. Did they tell you why they wanted these serial num-
bers?

A. No.

Q. If they said, "Ms. Anthony, we would like that micro-
wave for $100. We'd like to pay you $100 for that,"
would you have sold it to them for $100?

A. Yes, uh-huh.

Because "[v]irtually no customers exercised the 'option' to
'return' the property," the Division found, "customers clearly
acted as though the transaction involved the loan and repay-
ment of money."

Appellants "behaved more like a lender than a lessor" in
handling delinquent customers, the Division observed. It was
undisputed that, as the Division put it, if customers "failed to
make intervening payments, [appellants] called the customer
to demand payment" and that "if phone calls proved unsuc-
cessful in securing payment, [appellants] followed up with
dunning letters [advising] the customer that they would 'use
all means necessary to collect this amount.' "

Moreover, the calls appellants made to delinquent custom-
ers demanded payment, not return of the goods. The "dun-
ning" letters, which followed these calls, did not mention
return of the goods. In fact, appellants made no effort to
repossess the property that they had purportedly purchased.
That appellants did not demand return of the property, or

otherwise seek to repossess it, was "evidence," according to the Division, "of their own understanding that the true nature of the transaction did not involve the listed property, but rather the advance and repayment of money."

We therefore hold that the Division did not err in looking beneath the forms, into the substance of the transaction, to determine that appellants "engaged in small loan transactions in the form of sale-leaseback transactions." And that is precisely the approach that other jurisdictions have taken. *See,* e.g., *Fox v. Peck Iron & Metal Co.,* 25 B.R. 674, 688–92 (Bankr.S.D.Cal.1982)(looking to the substance of a sale and lease-back transaction to hold that it was really a usurious loan); *SAL Leasing Inc. v. State,* 198 Ariz. 434, 10 P.3d 1221, 1227–28 (Ct.App.2000)(holding that sale and lease-back of vehicles were disguised usurious loans violating Consumer Lenders Act); *Burr v. Capital Reserve Corp.,* 71 Cal.2d 983, 80 Cal.Rptr. 345, 458 P.2d 185, 192 (1969)(upholding trial court finding that the substance a sale-leaseback transaction was really a usurious loan); *Halco Fin. Servs., Inc. v. Foster,* 770 S.W.2d 554, 555–56 (Tenn.Ct.App.1989)(looking to the substance of a sale and lease-back transaction to hold that it was really a usurious loan).

What is more, the evidence is so compelling that the transaction was a loan and not a lease, that even if we apply the UCC, as appellants urge us to do, we reach the same result: appellants' sale-leaseback was nothing more than a loan. UCC § 2A–103(1)(j) defines a "lease" as "a transfer of the right to possession and use of goods for a term in return for consideration, but a sale, including a sale on approval or a sale or return, or retention or creation of a security interest is not a lease." Moreover, "[i]f a transaction creates a lease and not a security interest, the lessee's interest in the goods is limited to its leasehold estate; the residual interest belongs to the lessor." Official Comment UCC § 1–201(37). In other words, as one commentator has observed, "[t]he central figure of a true lease is the reservation of an economically meaningful interest to the lessor at the end of the lease term." Edwin

E. Huddleston, III, *Old Wine in New Bottles: UCC Article 2A–Leases,* 39 Ala. L.Rev. 615, 625 (1988).

After concluding that, under the Consumer Loan Law, the sale-leaseback was a loan, the Division turned to the UCC. And there it found additional support for that proposition. According to the UCC, a key element of a true lease was the reversionary interest of the lessor. And that element, as the Division observed, "was absent from [appellants'] business."

In reaching that conclusion, the Division recounted the actions of appellants that demonstrated that the property was "of little or no value" to them. Appellants, it noted, did not appraise or inspect the property, but only obtained "a general description of the item and a serial or model number." The option sheets, it observed, did not reflect the option of returning the property to terminate the program until March 1996—approximately two years after appellants opened their first Maryland store in January 1994. And, as noted earlier, neither appellants' collection calls nor dunning letters demanded the return of property.

The Division also pointed out that appellants never sought to repossess the property when a delinquent customer's deposit check was dishonored. Instead, the Division observed, appellants "would credit the customer with 'free time' and close the customer's account." The Division also noted that appellants kept no record of returned property during their first two years of operation.[13] And on the few occasions where customers surrendered property, the Division continued, appellants "treated the goods as having negligible value and abandoned them"; they sought neither to re-lease the property nor to sell it.

In fact, when asked what appellants do with returned property, Brown testified that "[w]e use it in our offices." He explained that all of the microwave ovens used in the stores

---

**13.** The Division however found in March 1996, after Seo was deposed, that appellants "created a form entitled 'Rental Return Receipt," given to customers who terminated the transaction by surrendering the property.

were "return rentals," that the returned televisions were used to monitor advertisements, and that, to sell items, they "put a price tag on them," "display[ed] them in [their] offices," and attempted to sell them at flea markets. But Seo testified that he had never seen a bill of sale "reflecting a sale of a returned good." · And, as the Division observed, in their 1995 and 1996 "Personal Property Return" forms, appellants described the nature of their business as "investment activities" and did not claim as personal property any of the items "purchased" in their transactions. The "filings demonstrate," the Division opined, "an understanding that [appellants] were in the business of lending money and had no genuine interest in the property listed in the transactional documents."

As a last effort to convince this Court that their sale-leaseback transaction satisfies the definition of a lease under UCC § 2A–103(1)(j) and not of a "security interest" under UCC § 1–201(37), appellants argue that, because UCC § 1–201(37), as amended, deleted all reference to the parties' intent,[14] the Division erred by looking beyond the terms of an agreement, in determining that the sale-leaseback transaction created a security interest. But that argument we need not reach.

Even if we assume that the sale-leaseback created a lease under the UCC, that conflicts with the Division's determination that the transaction was a loan under the Consumer Loan Law. And, as noted earlier, in the event of such a conflict, the latter law prevails.

Appellants also contend that the record does not support the Division's conclusion that customers testified "that if they had been made aware of an option to surrender property to be relieved of their repayment obligation, they would have done

---

14. The Official Comment to CL § 1–201 states that amended CL § 1–201(37) deleted "all reference to the parties' intent" because "[r]eference to the intent of the parties to create a lease or security interest has led to unfortunate results." It further states: "Whether a transaction creates a lease or security interest continues to be determined by the facts of each case."

so." We disagree. Indeed, appellants concede that at least one witness, Sharon Martin, said, "Yes," when asked, "If anybody had told you you could turn in your car phone and radio and not have to pay the $200 back, would you have?" Other customers gave similar testimony. When queried, "If someone had offered to take the TVs off your hands for $200, what would your response have been?" Cynthia Peacock replied, "[I]f I could have gotten $50 for both of them, it would have been good." Customer Joanne Anthony agreed. She was asked: "If they said, 'Ms. Anthony, we would like that microwave for $100. We'd like to pay you $100 for that,' would you have sold it to them for $100?" "Yes," she responded.

And finally, appellants argue that the Division abused its discretion in denying their motion to reopen the record to show that, after appellants began including the option to return property in their options sheet, the number of property returns "did not increase significantly." That abuse of discretion continued, appellants contend, in the Division's relying on the small number of returns–84 instances, from July 1994 through September 1996–to support its finding that customers did not understand that returning the property was an option. "The number of property returns," appellants claim, "is meaningless as any indication of the level of consumer awareness" without a showing of "how many customers would choose the option if they had perfect information." A "lack of consumer action does not necessarily reflect any lack of consumer understanding," appellants state. In support of that assertion, appellants rely on the testimony of Mayo Simpson, a customer who testified that he understood that he could "return the merchandise" and "be out of their program."

"The discretion of an administrative agency to admit evidence after the hearing is arguably broader than the discretion that is generally accorded to trial judges...." *Md. State Police v. Zeigler*, 330 Md. 540, 557, 625 A.2d 914 (1993). And when the exercise of that discretion "does not violate regulations, statutes, common law principles, due process and

other constitutional requirements, it is ordinarily unreviewable by the courts." *Id.* In other words, "courts are authorized to intervene" only when "an agency's exercise of discretion, in an adjudicatory proceeding, is 'arbitrary' or 'capricious'" *Id.* at 558, 625 A.2d 914.

The Division's refusal to reopen the record was neither arbitrary nor capricious. The Division's finding that the sale-leaseback transaction was really a usurious loan was not premised solely on the small number of transactions that were terminated by customers surrendering their property. As noted above, the Division considered "all the circumstances of the transaction." Moreover, as the Division observed, the evidence that "virtually all consumers continued to repay the money," instead of returning their property, "is entirely consistent with the [Division's] finding that [appellants were] providing consumers with short-term cash."

And we understand why the Division was not swayed by Mayo Simpson's testimony. The Division points out that, while Simpson testified that he understood that he could terminate the program by surrendering the property, it "became apparent that his knowledge was acquired at some point after the transaction." In fact, he testified that he signed a bill of sale on January 20, 1995, even though appellants had not begun using a bill of sale until June of that year; and that, in January of 1995, he signed a "four item option sheet" even though appellants had not added the fourth option to their options sheet until March 1996.

## II.

Appellants contend that the Division's finding that it "misrepresented the terms of their lease transactions through oral misrepresentations and a written 'options sheet' is not based on substantial evidence." We disagree.

The Division found:

Through oral representations and use of the green options sheet, [appellants] represented to customers that they

were required to 'purchase' the goods 'sold' to [appellants] using one of the three purchase options as recited on the options sheet.

That finding, as we have previously discussed at length, is supported by substantial evidence. Customer Sharon Martin was asked: "What did you think you had to do to get out of the program then?" She responded, "Pay back the money in full." She was then asked: "Did they say anything about bringing the goods back?" She said, "No, that was never mentioned." Customer Cynthia Peacock was queried, "Apart from explaining your payment options, did they give you any other options for concluding the transaction?" She replied, "No, . . . just the payment plan." And customer Sheila Chambers was asked: "After reviewing the sheet with him, what was your understanding of what you had to do in this program?" She responded, "I had to follow . . . either Option 1 or Option 2 or Option 3." Similar testimony was given by other customers.

Even after the options sheet was revised to include the fourth option that permitted customers to surrender the property, the Division observed that that option was de-emphasized or ignored by appellants. The Division specifically found:

Following the adoption of the revised yellow multi-part options sheet, [appellants'] presentation of the sale-lease-back program still did not emphasize the fourth option to customers. When customers were signing the packet of documents presented to them, Respondents did not point out the addition of the fourth option. Nor did Respondents advise repeat customers that the forms had changed.

For example, Sharon Martin, a repeat customer, stated that when she entered into a second sale-leaseback transaction with appellants she was not told about any changes in the options sheet. Joanne Anthony testified that, although she received and signed the revised options sheet, she was not told that there was anything different about the program. And when customer Ruth Lampkin was asked, "Did they tell you

. . . if you want to fulfill your obligation just bring those items back in and you don't have to pay us the $200," she replied: "No." Since repeat customers comprised 80% of appellants' monthly business, the failure to inform them of changes in the options sheet was a serious, substantial, and misleading omission.

### III.

Appellants contend that the circuit court exceeded its authority by remanding the Division's Amended Final Order to the Division for clarification as to whether appellants could proceed with their sale-leaseback program, after providing certain consumer disclosures. According to appellants, the Division's prosecutors may not appeal a decision of the Division.

▮▮▮ Contrary to appellants' claim, the Division was "entitled to judicial review of a decision . . . if the agency was a party before the agency or the Office [of Administrative Hearings]." Md.Code (1984, 1999 Repl.Vol.), § 10–222(a)(2) of the State Government Article. Accordingly, the circuit court did not abuse its discretion in remanding the case to the Division.

### IV.

Appellants contend that the Division "erred as a matter of law in ordering appellants to pay automatic restitution to all consumers who engaged in the transactions during a three-year period, with no showing that such customers relied on appellants' allegedly deceptive practices."

Section 13–403(b)(1) of the Consumer Protection Act requires that the Division, having found a violation of the Consumer Protection Act, "shall state its findings and issue an order requiring the violator to cease and desist from the violation and to take affirmative action, including restitution of money or property." And section 12–314(b)(2) of the Consumer Loan Law specifically provides that a person who makes a

usurious loan "may not receive or retain any principal, interest, or other compensation with respect to [that] loan."

Given those two provisions, the Division did not have to show customer reliance to order restitution, only that appellants had made unlicensed usurious loans.[15] Adopting what it called a "middle course," the Division only required appellants to pay as restitution to former customers the "net monetary gain" appellants received from violating the Consumer Protection Act; namely, the "rent" payments received. Although that approach was less drastic than other alternatives, it had the desirable and lawful effect of preventing appellants from being unjustly enriched by their wrongful conduct. *See Consumer Prot. Div. v. Consumer Publ'g Co.,* 304 Md. 731, 776, 501 A.2d 48 (1985).

## V.

Appellants contend that the Division erred in imposing civil penalties on Seo and Brown instead of deferring to the ALJ's finding that they had acted in good faith.

---

**15.** When the Division shows any violation of the Consumer Protection Act, it can "order . . . the violator to cease and desist from the violation and to take affirmative action, including [to make] restitution of money or property." CL § 13–403(b)(1). The Division can also impose fines for any violation of the Consumer Protection Act. The Attorney General can ask the court for "any order of judgment necessary to . . . restore to a person any money . . . acquired from him by means of any prohibited practice." § 13–406(c)(2). In this case, the dispute centered around whether the transaction was an illegal loan. That issue was decided against appellants, so that there is no dispute that every person who entered such transaction paid money as a result of the "prohibited practice." This situation differs from one in which the consumer protection violation involves only a false or misleading representation or omission. *See* CL § 13–301. In such transactions, we cannot be so certain that the money paid by each consumer was "acquired from him by means of [the] prohibited practice" without proof that the consumer entered into the transaction as a result of deceptive representations or omissions. *See* § 13–408(a)("[A]ny person may bring an action to recover for injury for loss sustained by him as the result of a practice prohibited by this title"); *see also Citaramanis v. Hallowell,* 328 Md. 142, 151–53, 613 A.2d 964 (1992)(observing that the General Assembly intended that private recovery under Consumer Protection Act be given only for actual injury or loss sustained as a result of the conduct that violates the Act).

In determining that Seo and Brown should not be subject to civil penalties under CL § 13–410,[16] the ALJ found that Seo and Brown, prior to starting their sale-leaseback business in Maryland, had sought legal advice "in order to conform to existing law" and that, after they had been investigated by the Maryland Office of Consumer Credit, they had added a Bill of Sale to the transaction, and, after that, an option to return the goods to the options sheet. She also noted that they had sought advice from a UCC expert about the legality of the transaction.

The Division, on the other hand, found this purported evidence of good faith unconvincing. Although Seo and Brown did seek legal advice, they did not, the Division pointed out, "introduce into evidence the substance of the advice ... other than that the attorney reviewed the forms." As for their consultation with the UCC expert, the Division noted that "given the timing and circumstances, [that] consultation ... reveals little about whether they acted in good faith when they committed violations."

In fact, as the Division observed, the expert testified that Brown and Seo had showed the UCC expert the options sheet, containing the fourth option to return the goods, but did not show her the prior sheets, which excluded that option, because, in the expert's words, "they did not want to taint my opinion as to the documents that they were currently drafting." And, as we have previously stated, Seo and Brown devised the policies and practices of appellants and personally participated in thousands of transactions. Hence, there was substantial evidence presented that Seo and Brown were not

---

16. CL § 13–410(d) requires the Division to consider the following factors in imposing a civil penalty:
 (1) The severity of the violation for which the penalty is assessed;
 (2) The good faith of the violator;
 (3) Any history of prior violations;
 (4) Whether the amount of the penalty will achieve the desired deterrent purpose; and
 (5) Whether the issuance of a cease and desist order, including restitution, is insufficient for the protection of consumers. Md.Code (2000 Repl.Vol.), § 13–410(d) of the Commercial Law Article.

acting in good faith when they devised and implemented their "loan" scheme, whose true nature they tried to conceal by calling it a "sale-leaseback" program.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANTS**