*In the Matter of Cash-N-Go, Inc., et al.,* No. 1012, September Term, 2021. Opinion by Ripken, J.

**EQUITABLE ESTOPPEL – MARYLAND REGULATORY AGENCIES – APPLICABILITY**

State regulatory agencies should not be estopped from enforcing a valid law or regulation within the scope of their authority regardless of a claimant's contention that unlawful business practices were justified by reliance upon prior statements or conduct of state employees.

**EQUITABLE ESTOPPEL – MARYLAND REGULATORY AGENCIES – AFFIRMATIVE MISCONDUCT**

A state regulatory agency becoming aware of a claimant's illicit behavior and subsequently holding the claimant accountable for such behavior does not amount to the type of "affirmative misconduct" by the State that is required to support an estoppel claim.

**CONSUMER PROTECTION ACT – MARYLAND CONSUMER LENDING LAW – GOOD FAITH EXEMPTION**

The good faith exemption under CL § 12-316.1 does not limit the imposition of any civil penalty for a knowing or willful violation of the Consumer Loan Law or limit the power of the Commissioner or the courts to order restitution to a borrower of moneys collected in violation of the Consumer Loan Law.

**CONSUMER PROTECTION ACT – MARYLAND CONSUMER LENDING LAW – RESTITUTION AND CIVIL PENALTIES**

Section 12-314 of the Maryland Consumer Lending Law permits the Consumer Protection Division to order restitution amounts that include the principal, interest, and fees with respect to any loan deemed void or unenforceable under the Consumer Protection Act. Section 13-410 allows for a maximum civil penalty amount of $10,000 per violation of the Consumer Protection Act.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1012

September Term, 2021

_____

In the Matter of CASH-N-GO, INC., ET AL.

_____

Kehoe,
Ripken,
Tang,

JJ.

_____

Opinion by Ripken, J.

_____

Filed: November 30, 2022

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

On April 1, 2019, the Consumer Protection Division ("the Division") of the Office of the Attorney General of Maryland filed a statement of charges against Cash-N-Go, Inc., Cash-N-Go Pawnbrokers, LLC, Cash-N-Go Pawnbrokers, Inc., and the three business entities' sole owner, Brent Jackson ("Jackson") (collectively referred to as "Cash-N-Go"), for violations of several Maryland consumer protection laws. Cash-N-Go denied all allegations, and the Division referred the case to the Office of Administrative Hearings ("OAH"). After conducting a contested case hearing, the administrative law judge ("ALJ") filed a proposed decision, finding that Cash-N-Go had engaged in unfair or deceptive trade practices in violation of the Maryland Consumer Protection Act ("CPA").[1] The Division subsequently adopted the ALJ's proposed factual findings and conclusions of law, issued a cease-and-desist order prohibiting Cash-N-Go from continuing its unlawful consumer lending practices, and held all Cash-N-Go parties jointly and severally liable for restitution payments and civil penalties.[2]

On March 16, 2020, Cash-N-Go filed a petition for judicial review of the Division's final order in the Circuit Court for Allegany County. The circuit court held a hearing on July 9, 2021, and subsequently affirmed the Division's findings and assessment of penalties. Cash-N-Go now appeals to this Court. For the reasons that follow, we shall affirm.

---

[1] Md. Code Ann., Com. Law ("CL") §§ 13-101–13-501.

[2] The Division imposed $2,200,00 in restitution and $1,200,750 in civil penalties.

**ISSUES PRESENTED FOR REVIEW**

Cash-N-Go presents the following issues for our review:[3]

I.      Whether the Division must be estopped from enforcing Maryland's consumer protection laws against Cash-N-Go.

II.     Whether the Division's assessment of the penalties and restitution levied against Cash-N-Go violates the Excessive Fines Clause of the Eighth Amendment.

III.    Whether the circuit court erred in identifying Cash-N-Go, Inc. as the sole petitioner for judicial review of the Division's final order.

We hold (1) that the Division is not estopped from ordering penalties against Cash-N-Go for violating Maryland's consumer protection laws; (2) that the Division's assessment of penalties and restitution did not violate the Excessive Fines Clause of the Eighth Amendment; and (3) that the circuit court did not err in

---

[3] Condensed, rephrased, and reordered from the following:

I.      Did the Circuit Court err in excluding certain Cash-N-Go entities and Brent Jackson, individually, from participating in the administrative appeal by finding that prior counsel did not properly petition for judicial review on their behalf?

II.     Should the CPD be estopped from bringing claims against Appellants, given that multiple Maryland regulators had reviewed Appellants' business practices and explicitly or implicitly endorsed them, and given that Appellants ceased any disputed transactions at the first instance of any constructive notice that a "title pawn" transaction may be construed as violative of any Maryland law?

III.    Did the Circuit Court err in determining that the restitution and other penalties ordered in the administrative action were substantially justified by failing to take into account that nearly half of the alleged "restitution" funds were, in fact, monies legally owned by and originally advanced to consumers by the Cash-N-Go Appellants?

2

identifying Cash-N-Go, Inc. as the sole petitioner seeking judicial review of the Division's order.

## FACTUAL AND PROCEDURAL BACKGROUND

The Division adopted all factual findings made by the ALJ at the conclusion of an evidentiary hearing; no party objected to those factual findings. Therefore, the following statement of facts is largely derived from the Division's final order.

Cash-N-Go is a Maryland company that was incorporated in January of 1998 as "Cash & Go, Inc." before changing its name to "Cash-N-Go, Inc." in May of 2010. Cash-N-Go, Inc. has also conducted business as Cash-N-Go Pawnbrokers, Inc., Cash-N-Go Pawnbrokers LLC, and Cash-N-Go. Jackson is the sole owner and President of all Cash-N-Go business entities, and he has directed, overseen, and managed the business activities of each entity since their inceptions. Cash-N-Go obtained a check cashing license from the Maryland Commissioner of Financial Regulation ("CFR") and subsequently obtained a second-hand precious metal and pawnbroker license. Cash-N-Go has never been licensed by the CFR as an installment or consumer lender.

Cash-N-Go began offering financial services that it referred to as "title loans," "title pawns," or "cash advances," in 2007. The services were advertised as "loans, pawns, or purchasing valuables" at "the best value for [Cash-N-Go's] customers." Regarding "car title pawns," specifically, Cash-N-Go's website used language such as: "Need fast cash and [to] be able to keep your car? No worries! Our services allow you to continue to use your vehicle while we hold the title – a winning deal for our customers." Since Cash-N-Go began offering financial services in 2007, it has completed 1601 title pawn transactions,

3

ranging in amount from $140 to $6,000 each.

Generally, consumers would drive to a Cash-N-Go location to request a loan for personal, family, or household purposes. In turn, Cash-N-Go would lend them the money with the expectation of repayment on the principal amount of the loan plus interest. In accordance with Cash-N-Go's standard operating procedures, employees were instructed to base the amount of money they could offer for title pawns on the vehicle's condition, the consumer's ability to pay back the loan, and up to 30% of the vehicle's rough value. As a prerequisite to receiving a loan, the consumer was required to provide a Cash-N-Go employee with a free and clear title to his or her vehicle, proof of current vehicle registration, proof of current insurance, a spare key to the consumer's vehicle, a valid driver's license, proof of social security number, a current utility bill, and a current pay stub.[4]

Once the consumer provided the requisite documents, the employee would conduct a cursory inspection of the consumer's vehicle to record any preexisting damage and ensure that the provided spare key unlocked and started the car. Thereafter, the employee would prepare the loan paperwork, which included a contract, bill of sale, and a Maryland daily transaction report form. The employee would show the consumer where to sign, sometimes without giving the consumer a chance to review the documents. In order to "speed up the process" employees were instructed that consumers were not required to wait while the

---

[4] In contrast, consumers who wanted to pawn non-vehicle items of personal property were only required to provide Cash-N-Go with a driver's license, the property itself, and a signed pawn form.

employees filled out their portion of the daily transaction forms, "as long as [the consumers] sign[ed][.]" The employee would then deliver the cash advance or issue a check made payable directly to the consumer, who was then free to leave, loan in hand. Next, the employee would register the vehicle titles as pawned property with Maryland's Regional Automated Property Information Database ("RAPID").[5] Afterward, the employee would file a lien on the vehicle with the Maryland Motor Vehicle Administration ("MVA") and log the transaction in an internal spreadsheet.

Every title pawn contract that Cash-N-Go entered with consumers conveyed that the consumer would be required to make a payment within 30 days of receiving the loan. The contract contained a payment schedule, titled "minimum amount due," indicating a monthly charge of 30% of the loan principal (labeled "pawnshop charge"). The fine print at the bottom of the contract indicated that paying the pawnshop charge would allow consumers to extend their obligation to repay the loan principal by another month. Extending the loan each month by payment of the pawn charge would amount to an annual interest rate of 360%.

Notably, the contract did not accurately convey the structure of the loan. To pay off their loans, consumers were required to pay the entire principal amount plus 30% interest within 30 days. The loan documents did not indicate that minimum payments (the pawnshop charge) would not be subtracted from the principal amount owed. Nor did the documents adequately inform the consumer that if they only made the minimum monthly

---

[5] RAPID is a database that the state police use to track stolen property.

payment on their loan, the repayment terms would extend indefinitely. When consumers made monthly payments on the loans, they rarely received receipts. If a receipt was issued, it did not clearly indicate that the consumer's payment was being credited toward interest rather than the loan principal.

One consumer who contracted with the Cash-N-Go location in Hagerstown expressed that the "receipts" he received after making monthly payments relayed nothing more than his "loan number, the payment date, the amount of [his] payment, and the remaining loan balance," and that it "seemed like [his] loan balance never went down[.]" Another consumer who contracted with Cash-N-Go's Westminster location stated that he "had no idea what the total cost of the loan would be" and that he "did not know how long [he] would have to make payments on the loan." Another Westminster consumer testified that he knew "something [was not] right" when he noticed that, even after several months of paying more than the contracted minimum amount on his loan, his "principle [sic] was the same."

Consumers were thus faced with either paying significantly more money on their loans than they originally understood or risking repossession of their vehicles. The grace period for late payments was typically two weeks, whereafter an officer or agent of Cash-N-Go would, without written notice, repossess the consumer's vehicle using the spare key that the consumer provided to obtain the loan. In order to recover their repossessed vehicles from Cash-N-Go, consumers were required to pay the outstanding balance on their loans plus additional fees. Occasionally, Cash-N-Go would sell a repossessed vehicle without providing the consumer with a full accounting of the sale proceeds. Additionally, Cash-N-

6

Go failed to return to consumers any proceeds that exceeded the outstanding balances of their loans. Cash-N-Go collected a total of over $2.2 million in repayment funds on the 1,601 loans it made between 2007 and 2016 and repossessed 147 vehicles.

On April 1, 2019, the Division filed a statement of charges against Cash-N-Go, asserting that the company was in violation of Maryland consumer lending laws for unfair and deceptive trade practices, such as providing loans and offering credit without a license, charging usurious interest rates, and taking prohibited security interests in consumers' personal property. Cash-N-Go denied all allegations of wrongdoing, and the Division referred the case to the OAH to conduct a contested case hearing and render proposed findings of fact and conclusions of law. The presiding ALJ conducted a hearing on July 16, 2019, in which extensive evidence was presented.[6] At the conclusion of the hearing, both Cash-N-Go and the Division filed proposed findings of fact and conclusions of law with the OAH.

On October 25, 2019, the ALJ filed a proposed decision, finding that Cash-N-Go had engaged in unfair or deceptive trade practices that violated the CPA by:

---

[6] There was live testimony from a Cash-N-Go general manager; a Cash-N-Go consumer; a former examiner for the Office of the Commissioner of Financial Regulation ("CFR"); the Division's Chief Investigator; the Assistant Commissioner of Finance at the Department of Labor, Licensing, and Regulation ("DLLR"); and a DLLR investigator. An additional Cash-N-Go consumer testified via telephone. The Division offered over 100 exhibits into evidence, including but not limited to: transcript excerpts of depositions examining Jackson and Cash-N-Go's general manager; several title pawn contracts and consumer files; Cash-N-Go advertising materials; an affidavit by an examiner from the CFR Compliance Unit; Cash-N-Go's pawnbroker's licensing files with the DLLR; Cash-N-Go's licensing files with the CFR; several CFR check cashing examination reports; and seven consumer affidavits.

7

(1) misrepresenting illegal consumer loans as "pawn" transactions; (2) offering consumers credit without the required licenses; (3) charging usurious interest rates; (4) otherwise failing to comply with Maryland consumer lending laws; and (5) illegally repossessing consumers' vehicles. The Division subsequently adopted the ALJ's proposed factual findings and conclusions of law and issued a cease-and-desist order prohibiting Cash-N-Go from continuing its unlawful consumer lending practices without first obtaining the appropriate licenses. After evaluating the ALJ's findings and conclusions, the Division held all Cash-N-Go parties, including Jackson in his individual capacity, jointly and severally liable for the violations and ordered Cash-N-Go to pay restitution, civil penalties, and costs.

On March 16, 2020, Cash-N-Go filed a petition in the Circuit Court for Allegany County for judicial review of the Division's final order. The petition's caption listed "Cash-N-Go, Inc., *et al.*" as the Petitioner. The circuit court conducted a hearing on July 9, 2021. On August 10, 2021, the circuit court issued a memorandum in which it found that Cash-N-Go, Inc. was the sole petitioner for judicial review and affirmed the Division's findings and assessment of penalties.

## A. Involvement of State Agencies

### 1. Commission of Financial Regulation

On January 29, 2009, two examiners from the CFR's Compliance Unit conducted an examination of the check cashing services at Cash-N-Go's Westminster location. One of the CFR examiners testified that the "purpose and scope of the examination was the check cashing business with regard to their check cashing license, which include[ed]

8

debt[,] the cash checking statute[,] and any money laundering statutes that were applicable." The examiner testified that she was not authorized to investigate anything related to consumer lending or pawnbroking because a separate unit within DLLR was responsible for monitoring such activities. After completing an examination of the check cashing "operations, money services business status, record retention, consumer complaints[,] and fee structure," the examiner indicated in her January report that Cash-N-Go's check cashing services were "unsatisfactory."

During the CFR investigation, an examiner inquired about a neon sign in the shop's window advertising "title loans." The manager there at the time informed the examiner that Cash-N-Go did not offer "title loans" but "title pawns," with the appropriate license. The examiner instructed the manager to remove the sign because title loans were "not permitted under the Maryland law as the usury limits restrain car title loans." The examiner testified that she did not inquire further about the company's "title pawn" practices because that "was not the scope of why [she] was there." Rather, she took the manager's word at face value that the title pawn transactions were in accordance with Cash-N-Go's pawnbroker license. On December 26, 2009, the Cash-N-Go manager informed the CFR that all neon signage had been changed from "title loans" to "title pawns."

On November 7, 2014, CFR examiners met with the same manager at Cash-N-Go's Hagerstown location. The examiners inquired "why Cash-N-Go, which held pawnbroker and check-casher licenses, did not possess a consumer lender license" if they were offering "title pawn loans." The manager responded that he "believed the pawnbroker license was all that was required" to conduct the title pawn transactions. The CFR examiner(s) warned

the manager that Cash-N-Go's "ongoing business as a title pawn lender"—without a consumer lender license—"plac[ed] the business in conflict with Maryland consumer lending laws."

### 2. Motor Vehicle Administration

As part of the title pawn transaction procedures, Cash-N-Go employees were instructed to file liens with the MVA on every vehicle title they obtained. The lien amount reflected the total amount the consumer owed on the loan (principal plus 30% interest). The MVA did not advise Cash-N-Go that taking such liens through title pawn transactions was a violation of Maryland law.

### 3. Maryland State Police

In 2009, the Maryland State Police ("MSP") began utilizing and maintaining RAPID to track and recover stolen property. As per Cash-N-Go's operating procedures, employees were instructed to input each title pawn transaction into RAPID and log information such as the consumer's name, the make and model of the vehicle, the vehicle's identification number, that Cash-N-Go was the purchaser, and the location at which the transaction occurred. An MSP employee would be able to see that Cash-N-Go's logged transaction was listed as a "pawn," but there was nothing in RAPID that screened for whether the "pawn" transaction was valid or was actually a loan. The MSP did not monitor for, nor did it advise Cash-N-Go that providing title pawns was a violation of Maryland law.

## B. West Virginia Case

The Cash-N-Go President and sole owner, Jackson, was formerly investigated and

charged with engaging in illicit vehicle title loan transactions in West Virginia under the business name Pawn America. *See State ex rel. McGraw v. Pawn Am.*, 205 W. Va. 431 (1998). In March of 1997, the West Virginia Attorney General's Office filed a complaint and petition for injunction against Pawn America for violations of the West Virginia Consumer Credit and Protection Act ("CCPA"). Complaint and Petition for Injunction, *State ex rel. McGraw v. Pawn Am.*, 205 W. Va. 431 (1998) (No. 97-C-125). The CCPA required consumer lenders to be licensed and limited the interest rate that they could charge on consumer loans. *See Pawn Am.*, 205 W. Va. at 433; *see also* W. Va. Code § 46A-4-101, § 46A-3-104. In a defense comparable to that asserted in this case, Jackson denied the allegations of wrongdoing. *Pawn Am.*, 205 W. Va. at 433. He claimed that the CCPA was inapplicable to Pawn America's title lending activities because they were pawn transactions and not consumer loans. *Id.* The Circuit Court of Berkeley County, West Virginia, issued a final order in which it described Pawn America's title loan transactions in the following way:

> A consumer approaches Pawn America with the intent to borrow money; in exchange for the money being lent, the consumer is required to deliver to Pawn America a clear certificate of title to his/her motor vehicle and to endorse the title in blank; the consumer is required to pay a fee of 25% of the loan amount for a two week loan (which translates into an interest rate of 65% when annualized); that the loan may be renewed for additional two-week periods so long as the consumer pays an additional 25% 'finance charge' for each such two-week period; that the consumer is permitted to retain possession of the vehicle unless, and until, he/she defaults on a payment; and Pawn America does not store the motor vehicle on which it loans money at its Martinsburg location, rather if the consumer does not pay the amounts owed to Pawn America in a timely fashion, then Pawn America 'repossesses' the consumer's vehicle.

*Id.* at 432. After Pawn America appealed the circuit court's order, the Supreme Court of Appeals of West Virginia issued an opinion, holding that Pawn America's title lending activities were "a 'pawn' in name only, and in reality a consumer loan with an usurious interest rate—not a true pawn." *Id.* at 434.

The West Virginia case resulted in a consent order and permanent injunction under which Pawn America was "permanently ENJOINED and RESTRAINED from making any title pawns, original or renewal, in West Virginia, through a pawnshop or otherwise . . . until they have complied with appropriate provisions of the [CCPA]." Consent Order and Permanent Injunction at 3, *State ex rel. McGraw v. Pawn Am.*, 205 W. Va. 431 (1998) (No. 97-C-125) (emphasis in original). Consequently, Pawn America was required to return all vehicles and keys it had obtained through its title loan transactions and was ordered to pay the State a fine as settlement. *Id.* at 3–4.

## DISCUSSION

At the outset we note that we rely upon the following definition of "pawn" transaction:

> a loan of money by a dealer on deposit or pledge of personal property or other valuable thing other than securities or printed evidences of indebtedness, or a purchase by a dealer of personal property or other valuable things on condition of selling the same back at a stipulated price.

Md. Code Ann., Bus. Reg. § 12-101(h). Furthermore, we adopt the definition of "loan" as articulated in the Division's final order and relied upon by the circuit court:

> "[L]oan" or "consumer loan" means any loan or advance of money or credit made, provided, advertised, offered, or made available to any Maryland consumer regardless of what the loan is called or how it is characterized, and thus includes, for example, any secured consumer loan that permits a

consumer to retain use and control of their vehicle or other secured personal property while repaying the loan, including, but not limited to, transactions characterized as "vehicle title loans," "title loans," "vehicle title pawns," or "title pawns." A loan that is primarily for personal, household, family, or agricultural purposes constitutes "consumer credit" within the meaning of § 13-101(d)(1) of the CPA.

The purpose of the CPA is to "set certain minimum statewide standards for the protection of consumers across the State," CL § 13-102(b)(1), by which the State "should take strong protective and preventive steps to investigate unlawful consumer practices, to assist the public in obtaining relief from these practices, and to prevent these practices from occurring in Maryland." CL § 13-102(b)(3). As such, the General Assembly intended the CPA to be "construed and applied liberally to promote its purpose." *Goshen Run Homeowners Ass'n v. Cisneros*, 467 Md. 74, 94 (2020) (quoting CL § 13-105). Thus, the statute covers a broad range of "unfair, abusive, or deceptive trade practices," including, in pertinent part:

(1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

(2)(ii) Representation that . . . [a] merchant has a sponsorship, approval, status, affiliation, or connection which he does not have; [and]

(3) Failure to state a material fact if the failure deceives or tends to deceive[.]

CL §§ 13-301(1), (2)(ii), (3). Violations of the CPA encompass violations of the Maryland Consumer Lending Law ("MCLL") and related statutes, including the Maryland Interest and Usury Law ("MIUL") and the Installment Loan-Licensing Provisions ("ILLP"). The

13

MCLL governs "any loan or advance of money or credit" of $6,000 or less[7] when said loan is made primarily for "personal, family, or household purposes." *See* CL § 12-314(a) (2018); CL §§ 12-301, 12-303(a)(1). Under the MCLL, "[a] person may not engage in the business of making loans under this subtitle unless the person is licensed under or is exempt from the licensing requirements of Title 11, Subtitle 2 of the Financial Institutions Article, the Maryland Consumer Loan Law – Licensing Provisions." CL § 12-302; Fin. Inst. § 11-201(c); *see also* CL § 12-314(a)(3) (2018).

## I. THE DIVISION IS NOT ESTOPPED FROM ORDERING AND ENFORCING RESTITUTION AND OTHER PENALTIES AGAINST CASH-N-GO FOR VIOLATING MARYLAND CONSUMER PROTECTION LAWS.

Cash-N-Go argues that the Division should be estopped from bringing claims against it under the CPA because Cash-N-Go detrimentally relied upon the "implicit[] or explicit[]" endorsement of "three separate Maryland administrative agencies." In response, the Division contends that the doctrine of equitable estoppel cannot be asserted against the State in this context and that, even if the doctrine could apply, Cash-N-Go failed to establish the elements necessary to invoke equitable estoppel.

We begin by addressing whether the doctrine of equitable estoppel may be asserted against the Division under these circumstances. Then, we discuss whether Cash-N-Go successfully established the elements of equitable estoppel: (1) a voluntary representation of one party; (2) that is relied upon by the other party; (3) to the other party's detriment.

---

[7] The MCLL has since been amended to govern any such loans of "$25,000 or less[.]" *See* CL § 12-314(a) (2019).

*Reichs Ford Rd. Joint Venture v. State Rd. Comm'n of the State Highway Admin.*, 388 Md. 500, 524 (2005).

**Standard of Review**

Whether the Division properly applied the doctrine of equitable estoppel to the evidence in the record is a mixed question of law and fact. Typically, this Court will affirm a circuit court's judgment concerning a mixed question of law and fact "when we cannot say that its evidentiary findings were clearly erroneous, and we find no error in that court's application of the law." *See Fischbach v. Fischbach*, 187 Md. App. 61, 88 (2009). However, "an agency's interpretation of the meaning and intent of its own regulation is entitled to deference." *Pollock v. Patuxent Inst. Bd. of Rev.*, 374 Md. 463, 505 n.6 (2003) (quoting *Changing Point, Inc. v. Md. Health Res. Planning Comm'n*, 87 Md. App. 150, 160 (1991)). Therefore, when faced with a mixed question of law and fact arising from an agency decision, as here, we apply the substantial evidence test—that is, the same standard of review we would apply to an agency's purely factual finding.[8] *See Charles Cnty. Dept. of Soc. Servs. v. Vann,* 382 Md. 286, 296 (2004) (citing *Pollock*, 374 Md. at 469 n.3; *Ramsay, Scarlett & Co. v. Comptroller*, 302 Md. 825, 837–38 (1985)).

Under the substantial evidence test, this Court's "review of the agency's factual findings entails only an appraisal and evaluation of the agency's fact finding and not an

---

[8] The ALJ addressed Cash-N-Go's equitable estoppel argument in its proposed decision to the Division. The ALJ considered the doctrine's applicability according to three elements: (1) voluntary representation; (2) good faith reliance; and (3) detriment. Because the Division adopted and incorporated all of the ALJ's factual findings and conclusions of law, we review the equitable estoppel claim as though the Division itself had conducted the analysis.

15

independent decision on the evidence." *Catonsville Nursing Home, Inc. v. Loveman*, 349 Md. 560, 568–69 (1998). In this context, the substantial evidence test "has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]'" *Id.* at 569 (quoting *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 512 (1978)).

## A. The Doctrine of Equitable Estoppel May Not Be Invoked Against the Division in this Case.

"Equitable estoppel operates as a technical rule of law to prevent a party from asserting his rights where it would be inequitable and unconscionable to assert those rights." *Salisbury Beauty Schs. v. State Bd. of Cosmetologists*, 268 Md. 32, 62 (1973) (citing, e.g., *Fitch v. Double 'U' Sales Corp.*, 212 Md. 324, 339 (1957)). Generally, "the doctrine of estoppel will not be applied against the State in the performance of its governmental, public[,] or sovereign capacity or in the enforcement of police measures." *Salisbury Beauty Schs.*, 268 Md. at 63; *see also ARA Health Servs., Inc. v. Dep't of Pub. Safety & Corr. Servs.*, 344 Md. 85, 96 (1996) ("Ordinarily, the doctrine of estoppel does not apply against the State[.]"). The State "cannot be estopped by the acts and conduct of its officers or agents in the performance" of their legal duties because "no administrative officer is vested with the power to abrogate the statute law of the State, nor grant to an individual an exemption from the general operation of the law." *Salisbury Beauty Schs.*, 268 Md. at 64 (quoting *Comptroller of Treasury, Retail Sales Tax Div. v. Atlas Gen. Indus.*, 234 Md. 77, 84 (1964)). Thus, the State should not be estopped from "applying an otherwise valid law or regulation because of the prior statements or conduct of public

16

employees, upon which the claimant detrimentally relied, which led the claimant to assume that the applicable law was otherwise." *Md. Transp. Auth. Police Lodge 34 of Fraternal Ord. of Police, Inc. v. Md. Transp. Auth.*, 195 Md. App. 124, 219 (2010), *rev'd on other grounds*, 420 Md. 141 (2011). To do so would "deprive the public of the protection of a statute because of mistaken action or lack of action on the part of public officials." *Salisbury Beauty Schs.*, 268 Md. at 64–65.

Cash-N-Go argues that the circumstances of this case move it beyond the "ordinary." Relying on *Deese v. Esper*, 483 F. Supp. 3d 290 (D. Md. 2020), Cash-N-Go postulates that an estoppel claim against the State may succeed where it does not threaten state resources or public policy and the claimant can prove the "traditional" elements of estoppel in addition to some "affirmative misconduct." *Id.* at 316 (quoting *Angeles v. District Director*, 729 F. Supp. 479, 485 (D. Md. 1990)).

We disagree that Cash-N-Go's circumstances move it beyond the ordinary. Even if we agreed with Cash-N-Go's claim that the Maryland state regulatory authorities failed to alert the company that its business practices were unlawful, estopping the Division from enforcing the CPA would certainly "deprive the public of the protection of [the] statute[.]" *Salisbury Beauty Schs.*, 268 Md. at 64. Therefore, we refrain from applying the doctrine of equitable estoppel against the Division in this case.

## B. Cash-N-Go Failed to Establish the Requisite Elements to Invoke Equitable Estoppel.

Supposing we were to accept Cash-N-Go's argument that equitable estoppel can be invoked against the Division in this case, Cash-N-Go has nonetheless failed to establish

17

the elements necessary to invoke the doctrine. There was no misrepresentation; there was no good faith reliance; and Cash-N-Go suffered no detriment because of the Division's actions.

> 1. *Maryland state agencies did not misrepresent the legality of Cash-N-Go's cash lending practices.*

Cash-N-Go contends that the state regulatory agencies committed "affirmative misconduct by misleading Cash-N-Go in multiple written representations that they could continue with 'Title Pawn' transactions, and then years later changing this posture and charging them with significant and willful violations of Maryland law." In support, Cash-N-Go references several audits from 2011 in which the CFR reported "satisfactory" ratings and that "there were no State or Federal violations discovered during this examination period." Cash-N-Go also highlights an inspection report from 2009, in which CFR examiners stated that Cash-N-Go "maintains a Second Hand Precious Metal Object Dealer license issued by the State of Maryland which allows for the processing of Title Pawns." In addition to the CFR's representations, Cash-N-Go argues that "Maryland State Police and MVA both implicitly endorsed Cash-N-Go's title pawn practice" because they failed to raise any complaints or concerns regarding the company's title pawn transactions "at any time."

The Division responds by emphasizing that the scope of the CFR investigations was limited to Cash-N-Go's check cashing activities. Consequently, "[t]he CFR never requested, reviewed, or inspected any records related to any of Cash-N-Go's other business activities, including any pawnbroker or lending activities." Concerning MSP and the MVA,

the Division similarly argues: "Neither of these state agencies were tasked with investigating or approving Cash-N-Go, Inc.'s lending activities." Consequently, the Division contends that there were no circumstances in which the regulatory authorities would have had grounds to file complaints prior to the CFR investigating Cash-N-Go's title pawn transactions in depth in 2014. We agree.

The crux of Cash-N-Go's estoppel claim rests upon the inaccurate premise that the title pawn transactions it was engaging in were true pawn transactions rather than unlawful consumer loans governed by the CPA. There is substantial evidence in the record—that both the Division and the circuit court discussed at length—to support the conclusion that Cash-N-Go's title pawn transactions were pawns in name alone. Over a century of Maryland precedent establishes that courts must "look[] beneath the form of the transaction at issue, into its 'true nature,' in determining whether it was a 'loan.'" *B&S Mktg. Enters., LLC v. Consumer Prot. Div.*, 153 Md. App. 130, 154 (2003) (citing *Andrews v. Poe*, 30 Md. 485, 487 (1869)). In *Hoffman v. Key Federal Savings & Loan Ass'n*, the Court of Appeals made clear:

> [N]o device or subterfuge of the lender will be permitted to shield him in taking more than the legal interest on a loan. In whatever part of the transaction usury may lurk, or in whatever form it may take, or under whatever guise the lender may attempt to evade the law, the court will seek to ascertain what the contract actually was between the parties and give the debtor relief.

286 Md. 28, 34 (1979) (quoting *Brenner v. Plitt*, 182 Md. 348 (1943)).

A state agency's representation that Cash-N-Go's "title pawns" were legal did not equate to a representation that the conduct behind the façade—offering title loans without

19

the appropriate license—was legal. A state agency becoming aware of a party's illicit behavior and subsequently holding it accountable for such behavior does not amount to the type of "affirmative misconduct" by the State that is required to support an estoppel claim.

### 2. Cash-N-Go did not rely upon the State's conduct in good faith.

An estoppel claim may be supported when the "acts of one party cause a prejudicial change in the conduct of the other." *Bean v. Steuart Petroleum Co.*, 244 Md. 459, 469 (1966) (citing *Harrison v. McCarty*, 178 Md. 377 (1940)). The Court of Appeals has reiterated this Court's interpretation of "good faith" as "an intangible and abstract quality that encompasses . . . an honest belief, the absence of malice and the absence of design to defraud or to seek an unconscionable advantage." *See Rite Aid Corp. v. Hagley*, 374 Md. 665, 680–81 (2003) (citing *Catterton v. Coale*, 84 Md. App. 337, 342 (1990)); *see also Md. Reclamation Assocs. v. Harford Cnty.*, 414 Md. 1, 58 (2010) ("At the heart of establishing 'good faith' is proof that the claimant lacked knowledge of those facts that would have put it on sufficient notice that it should not rely on the government action in question."). The very existence of the element "good faith reliance" implies that one can rely upon the representations of another in *bad* faith—that is, dishonestly, with the intent to defraud or to seek an unconscionable advantage. *See Bricker v. Warch*, 152 Md. App. 119, 133 (2003) ("'Bad-faith' is the opposite of good faith; it *is not simply bad judgment or negligence, but it implies a dishonest purpose or some moral obliquity and a conscious doing of wrong*." (Emphasis in original)). Thus, the element of good faith reliance essentially "focuses upon the mental attitude of the [person] when he acted." *Md. Reclamation Assocs., Inc.*, 414 Md.

20

at 55 (citing *Sycamore Realty Co. v. People's Couns. of Balt. Cnty*, 344 Md. 57, 64 (1996) (discussing estoppel in the context of zoning restrictions)).

Cash-N-Go argues that it "made no secret that it was conducting 'Title Pawn' transactions and legitimately believed that such transactions were allowable under known or existing interpretations of statutory and regulatory authority." It further claims that "Cash-N-Go relied on its numerous interactions with Maryland authorities to conclude that 'Title Pawn' transactions were not violative of any Maryland legal prohibitions." Specifically, Cash-N-Go says it relied upon CFR examiners stating in a 2009 audit report that "[t]he licensee maintains a Second Hand Precious Metal Object Dealer license issued by the State of Maryland which allows for the processing of Title Pawns. . .. The license allows CASH-N-GO, INC. to conduct title pawn business for secondhand precious metal objects dealer and pawnbrokers." (Emphasis in original).

The Division argues that Cash-N-Go misrepresents the evidence when discussing its interactions with the CFR, MSP, and MVA. It is the Division's view that by "relying upon" the state agencies' so-called "endorsements," Cash-N-Go ignored the undisputed factual findings in the record. The Division maintains that the record shows that the state agencies did not alert Cash-N-Go to any unlawfulness because the company's illicit behavior was beyond the scope of the state agencies' regulatory authority. We agree.

First, the CFR does not regulate pawnbrokers. Rather, DLLR's Secondhand Precious Metal Objects and Pawnbrokers Licensing Unit is responsible for licensing, auditing, and investigating pawnbroker activities. The CFR's inspections were therefore limited by the scope of the agency's regulatory authority, which only encompassed Cash-

21

N-Go's check cashing activities. Both the CFR inspection reports and testimony by the examiners show that the CFR examiners "only requested, reviewed, and inspected Cash-N-Go's check cashing records" and that they "did not request, review, or inspect records related to any of Cash-N-Go's other business activities, including any pawnbroker or other lending activities." At 16 different points in her testimony, the CFR examiner told the ALJ that her examinations were limited to Cash-N-Go's check cashing activities or that she lacked the authority to draw conclusions about Cash-N-Go's pawnbroking or lending activities. Every report that Cash-N-Go received from the CFR was titled "Check Cashing Services Report of Examination," and the contents therein illustrated that the scope of the inspection was the company's check cashing services. For example, the first substantive page of every CFR report that was issued to Cash-N-Go reads:

> The Commissioner of Financial Regulation for the State of Maryland authorized an on-site examination of Cash-N-Go, Inc. The examination was conducted . . . pursuant to the Annotated Code of Maryland Financial Institution Law Article, Title 12, Subtitle 1, *Check Cashing Services*.

> The scope of the examination included a review of operations; records retention; fee structure; policies and procedures addressing consumer complaints; and money services business status.

(Emphasis added). Under the "Compliance" section of the reports, there is no mention of Cash-N-Go's title pawn activities, neither affirming nor negating whether Cash-N-Go's title pawn activities comply with federal laws. Rather, the reports merely state: "The Licensee is in compliance with all federal laws concerning *money laundering*." (Emphasis added). In all the reports cited by Cash-N-Go in which the CFR found no state or federal law violations, the only mention of title pawns is in the overview of Cash-N-Go's

22

operations, where the reports state, "Cash-N-Go, Inc. is a check cashing store with a network of nine stores that are located throughout Maryland. The Licensee's services include: vehicle title pawns, and check cashing. The licensee's primary source of revenue is generated with the fees charged for cashing personal checks." Notably, the CFR reports distinguish between Cash-N-Go's vehicle title pawn and cash checking activities. This distinction further supports that the two types of business activities are governed by different authorities altogether. As the ALJ astutely noted in her proposed decision, subsequently adopted by the CPD, "[i]t would be incredible to accept that because of [the CFR employees'] examination in the Respondents' check cashing activities, the CFR is bound to approve of each of the Respondents' business activities, including those that were not even examined."

The CFR first put Cash-N-Go on notice that its title loan practices were unlawful in 2009, during a routine inspection of Cash-N-Go's check cashing operations. A CFR examiner told the general manager of Cash-N-Go's Westminster location that the store was out of compliance because it had a neon sign in the window advertising "Title Loans." This observation about the signage was listed under "Other Findings" in her inspection report. The report read: "[T]itle loans are not permitted under the Maryland law as the usury limits restrain car title loans." The examiner testified that she noticed the sign during her inspection and subsequently had a brief conversation with the general manager about the sign. The manager told her, "[W]e don't do title loans, we do title pawns." Subsequently, the examiner warned him that he "need[ed] to take the title loans sign down because I know your interest rates are usually higher than our usury rates." The examiner further testified

23

that "as long as they were doing pawns with a pawn license, [she] took them at their word." In response to the 2009 CFR inspection, Cash-N-Go replaced its signage to read "Title Pawns"; however, Cash-N-Go made no change to its business operations.

The CFR warned Cash-N-Go about its potential violations for a second time in 2014. While investigating another title pawn lender, the CFR learned that Cash-N-Go was offering unlicensed consumer loans under the guise of "title pawns." The CFR initiated an investigation into Cash-N-Go, after which the CFR explicitly warned Cash-N-Go that "ongoing business as a title pawn lender place[d] the business in conflict with Maryland consumer lending laws." Cash-N-Go's contention that the CFR "endorsed" its title pawn transactions is therefore unfounded. There was no endorsement. Cash-N-Go was expressly warned that its business practices violated Maryland law, but Cash-N-Go nonetheless continued to issue title loans.

Cash-N-Go's argument that it relied upon "implicit endorsements" from the MSP and MVA is no more persuasive. Cash-N-Go claims that the MSP endorsed its title pawn practice "on a regular basis" because the state police reviewed the pawn transaction information that Cash-N-Go regularly uploaded to RAPID. Similarly, Cash-N-Go argues that the MVA endorsed its title pawn practices because the MVA raised no complaints, despite reviewing every Notice of Lien that Cash-N-Go filed for its title pawn transactions. According to Cash-N-Go, the MSP and MVA's failure to complain or initiate an investigation into the company's title pawn transactions was functionally equivalent to an endorsement of those transactions.

Cash-N-Go's arguments are unfounded. As established at the administrative

24

hearing, "RAPID does not determine whether a 'pawn' transaction is valid or is actually a loan." An employee reviewing an entry in RAPID would merely see that the transaction was listed as a "pawn," the vehicle's make and model, an identification number, the consumer's name, that Cash-N-Go was the purchaser, and the location at which the transaction occurred. Such information would have been and is insufficient to form an opinion about whether the transaction itself was legal. Similarly, as the circuit court explained, "[t]he MVA is not responsible for reviewing every lien filed to determine the legality of the underlying contract, including interest rates, loan terms, and the lender's license." Therefore, Cash-N-Go's filing of liens with the MVA does not establish an endorsement of Cash-N-Go's conduct.

Finally, the role of Jackson's prior litigation in West Virginia is not insignificant. Jackson's West Virginia company, Pawn America, operated identically to Cash-N-Go. After the West Virginia Attorney General's Office became aware of Pawn America's business practices, the company was investigated and found in violation of consumer protection laws in West Virginia that are comparable to those in Maryland. The West Virginia court found that "Pawn America's activities were "a 'pawn' in name only, and in reality a consumer loan with an usurious interest rate—not a true pawn." Thus, Jackson was on notice of the potential illegality of Cash-N-Go's title pawn transactions.

We, therefore, conclude that there is substantial evidence in the record demonstrating that Cash-N-Go did not rely upon the state agencies' actions in good faith.

25

*3. Cash-N-Go did not suffer a detriment because of the State's representations.*

Cash-N-Go contends that, due to its reliance upon state regulatory agencies' representations, it now faces the "detriment of civil prosecution by the CPD" and "financial penalties in the form of restitution of $2,200,000.00 and sanctions in the amount of $1,200,750.00." However, it is important to distinguish between suffering a detriment in the context of an estoppel claim and incurring penalties for ongoing illegal business practices. To reiterate, parties attempting to invoke equitable estoppel "must have been misled to [their] injury and have changed [their] position for the worse, having believed and relied on the representations of the party sought to be estopped." *Dickerson v. Longoria*, 414 Md. 419, 454 (2010) (citing *Creveling v. GEICO*, 376 Md. 72, 102 (2003)). At no point did Cash-N-Go change its position for the worse. To the contrary, Cash-N-Go began offering title loans in Maryland in 2007—two years before the company claims to have relied upon the CFR's reports to its detriment—and it continued to conduct the same business, in the same manner, despite its alleged reliance on the representations of the state agencies.

Because the doctrine of equitable estoppel cannot be applied to the Division in this case and, furthermore, because Cash-N-Go failed to establish the elements to support an estoppel claim, we hold that the Division is not estopped from imposing restitution and civil penalties against Cash-N-Go for its violations of consumer lending laws.

**II.** **THE DIVISION'S ASSESSMENT OF PENALTIES WAS PROPER UNDER THE CPA AND DID NOT VIOLATE THE EXCESSIVE FINES CLAUSE OF THE EIGHTH AMENDMENT.**

Cash-N-Go argues that "the draconian and illogical combination of the restitution award and the fines levied in this case shock the conscience and bear little relationship to either truly compensating individual consumers who may have suffered pecuniary loss, nor deterring the Cash-N-Go entities or Jackson from engaging in ongoing activities." Per Cash-N-Go, the restitution and civil penalties the Division ordered amount to the type of "excessive fines" prohibited by the Eighth Amendment. Furthermore, Cash-N-Go argues that the Division's calculation of restitution was inequitable and irrational because "order[ing] 'restitution' of amounts of monies which were lawfully possessed by Cash-N-Go and were never repaid to consumers who in fact, suffered no loss whatsoever" is contrary to the "commonly accepted definition" and purpose of restitution as a remedy.

In response, the Division argues that the Eighth Amendment does not apply to the restitution ordered pursuant to section 13-403 of the CPA nor the civil penalties ordered pursuant to section 13-410 of the CPA. Furthermore, the Division argues that, even if an Eighth Amendment analysis was applicable to the penalties imposed in this case, the analysis would not benefit Cash-N-Go because the fines were not "grossly disproportionate" based on the facts of this case and the statutory limits set by the legislature in the CPA.

We first address the Eighth Amendment's applicability to the Division's imposition of penalties. Then, we discuss the validity of the Division's calculation of restitution and

27

civil penalties under the CPA.[9]

**Standard of Review**

When reviewing an agency decision, this Court's primary goal is to decide "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Motor Vehicle Admin. v. Carpenter*, 424 Md. 401, 412 (2012). As such, we are "limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *Bd. of Physician Quality Assurance v. Banks*, 354 Md. 59, 67-68 (1999) (quoting *United Parcel v. People's Couns.*, 336 Md. 569, 577 (1994)). Therefore, this Court should defer to the agency's fact-finding and inferences if they are supported by the record. *Motor Vehicle Admin.*, 424 Md. at 413.

**A. The Eighth Amendment Does Not Apply.**

The Eighth Amendment states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. XIII. As the Supreme Court articulated in *United States v. Bajakajian*, "[A]t the time the Constitution was adopted, the word 'fine' was understood to mean a payment to a sovereign

---

[9] As a preliminary matter, Cash-N-Go did not raise an Eighth Amendment claim before the ALJ or in the Division proceedings below; therefore, Cash-N-Go is precluded from raising it here. *See Finucan v. Md. State Bd. of Physician Quality Assurance*, 151 Md. App. 399, 423 (2003) ("It has consistently been held that 'questions, including Constitutional issues, that could have been but were not presented to the administrative agency may not ordinarily be raised for the first time in any action for judicial review.'" (quoting *Bd. of Physician Quality Assurance v. Levitsky*, 353 Md. 188, 208 (1999))). However, because the Division did not object to Cash-N-Go raising the Eighth Amendment in its appeal, and because both sides put forth arguments regarding the issue, we substantively address the claim.

as punishment for some offense." 524 U.S. 321, 327 (1998) (internal quotations and citation omitted). While the Eighth Amendment has historically been applied to criminal fines and punishment, it also "protects against excessive civil fines[.]" *Hudson v. United States*, 522 U.S. 93, 103 (1997) (citing *Alexander v. United States*, 509 U.S. 544 (1993)); *see also Wemhoff v. City of Balt.*, 591 F. Supp. 2d 804, 808 (D. Md. 2008) (stating that the Excessive Fines Clause "reaches those civil fines designed at least in part to punish") (citing *Austin v. United States*, 509 U.S. 602, 610 (1993)).

However, courts have distinguished between civil fines serving remedial as opposed to pecuniary purposes. *See U.S. ex rel. Drakeford v. Tuomey*, 792 F. 3d 364, 387 (4th Cir. 2015) ("Civil fines serving remedial purposes do not fall within the reach of the Eighth Amendment."); *cf. Garrity v. Md. State Bd. of Plumbing*, 447 Md. 359, 384 (2016) (rejecting the contention that the Division's imposition of a large civil penalty for multiple violations "transform[ed] what was clearly intended as a civil remedy into a criminal penalty" subject to Eighth Amendment prohibition). Courts are tasked with applying the "principle of proportionality" when determining whether a civil remedy is, instead, a criminal penalty in disguise. *Bajakajian*, 524 U.S. at 334. In defining "proportionality," the Supreme Court held, in *Bajakajian*, that a punitive fine is violative of the Excessive Fines Clause "if it is grossly disproportional to the gravity of a defendant's offense." *Id.* The Court has additionally clarified that "'only the clearest proof could suffice to establish the unconstitutionality' of sanctions imposed by the government[.]" *Garrity*, 447 Md. at 384 (quoting *United States v. Ward*, 448 U.S. 242, 249 (1980)).

29

In this case, as set forth more fully below, the Division's imposition of restitution and remedial fines does not amount to the "gross disproportionality" contemplated by the Supreme Court. As such, no application of the Eighth Amendment's Excessive Fines Clause is warranted or appropriate.

**B. The Division's Restitution and Civil Penalty Calculations Were Supported by Substantial Evidence.**

The CPA expressly authorizes the Division to order restitution. *See* CL § 13-403(b)(1) ("If . . . the Division determines on the preponderance of the evidence that the alleged violator violated this title, the Division shall state its findings and issue an order requiring the violator . . . to take affirmative action, including the restitution of money or property."). Separately, section 13-410 outlines the guidelines for calculating civil penalties against merchants in violation of the CPA, allowing for fines up to $10,000 per violation. CL § 13-410(a). The Division sets the amount of an imposed penalty according to its assessment of the following factors:

> (1) The severity of the violation for which the penalty is assessed;
> (2) The good faith of the violator;
> (3) Any history of prior violations;
> (4) Whether the amount of the penalty will achieve the desired deterrent purpose; and
> (5) Whether the issuance of a cease and desist order, including restitution, is insufficient for the protection of consumers.

CL § 13-410(d). The authority by which the Division ordered restitution and civil penalties against Cash-N-Go are discussed below, in turn.

30

*1. Restitution*

In *Consumer Protection Division Office of the Attorney General v. Consumer Publishing Co.*, the Court of Appeals of Maryland adopted Professor Dan B. Dobbs's distinction between civil restitution and a damages action: "The damages recovery is to compensate the plaintiff and it pays him, theoretically, his losses. The restitution claim, on the other hand, is not aimed at compensating the plaintiff but at forcing the defendant to disgorge benefits it would be unjust for him to keep[.]" 304 Md. 731, 776 (1985) (quoting Dan B. Dobbs, *Law of Remedies* § 4.1 at 224 (1973)). Maryland's appellate courts have repeatedly affirmed this application of restitution. *See Luskin's, Inc. v. Consumer Prot. Div.*, 353 Md. 335, 383 (1999) (quoting Dobbs, *Law of Remedies* § 4.1); *Consumer Prot. Div. v. Morgan*, 387 Md. 125, 165 (2005) ("When a violator's misrepresentations and deceptions affect a number of similarly situated individuals, like the purchasers of diet pill plans in *Consumer Publishing* and spa memberships in *Andrews*, the Division may issue a general order of restitution."); *Linton v. Consumer Prot. Div.*, 467 Md. 502, 519–20 (2020) (noting that the underlying principle of the disgorgement remedy in restitution is that "a claimant potentially recovers more than a provable loss so that the defendant may be stripped of a wrongful gain" because "[a] person is not permitted to profit by his own wrong" (quoting Restatement (Third) of Restitution & Unjust Enrichment § 3, cmt. a (2011))); *see also State v. Andrews*, 73 Md. App. 80, 86 (1987) ("[T]he Division may enter a general order of restitution without proof of purchaser reliance, as long as the order

31

provides a mechanism for processing individual claims." (quoting *Consumer Publ'g*, 304 Md. at 775)).

Cash-N-Go asserts that the Division should have applied the "commonly accepted" definition of restitution. Cash-N-Go cites the *Oxford Advanced Learner's Dictionary*, which defines restitution as "the restoration of something lost or stolen to the proper owner; or recompense for injury or loss." *Restitution*, Oxford Learner's Dictionaries (May 19, 2022). Viewing the Division's restitution order through this lens, Cash-N-Go argues that the Division's calculation was inequitable. In support, Cash-N-Go points to the Division's Exhibit 20 at the administrative proceeding, which is a list comprised of all title pawn transactions Cash-N-Go entered into with consumers between 2007 and 2016. The exhibit denotes the record number of each transaction, the name of the consumer, the transaction date, the principal amount on the loan, and the total amount paid by the consumer. Based on its preferred definition of restitution, Cash-N-Go suggests that a proper calculation of restitution would have subtracted the total principal amount on the loans ($963,355.29)— "Cash-N-Go's own money that was advanced to consumers"—from the total gross amount that consumers ultimately paid ($2,225,823.12) to equal the "actual amount of interest, fees, or other charges in excess of the principal amount," or net proceeds, from their loans ($1,262,467.83). According to Cash-N-Go, it is inequitable to compel the company to repay "nearly One Million Dollars of funds" to consumers who "suffered no loss whatsoever" because they "never repaid a penny" of their loans.

Cash-N-Go further relies upon *B&S Marketing* in arguing that the appropriate restitution remedy would be a disgorgement of the net, as opposed to gross, proceeds from

the pawn transactions. 153 Md. App. 130 (2003). In *B&S Marketing*, this Court addressed whether the Division exceeded its authority by ordering violators of Maryland's consumer loan and protection laws to pay restitution to consumers without a showing of individual reliance by those consumers. *Id.* at 138. This Court explained that the Division need not show consumer reliance to order restitution, only that the appellants had made unlicensed usurious loans under section 12-314(b)(2) of the Consumer Loan Law. *Id.* at 168–69. However, Cash-N-Go highlights that, in *B&S Marketing*, the Division only required the appellants to pay, as restitution, the "net monetary gain" they received by violating the CPA. *Id.* at 169. The Division called this restitution order a "middle course," which was, as this Court articulated, a "less drastic [approach] than other alternatives[.]" *Id.* This Court reasoned that the Division's "less drastic" remedy was appropriate in that case because it still had "the desirable and lawful effect of preventing appellants from being unjustly enriched by their wrongful conduct." *Id.* (citing *Consumer Publ'g*, 304 Md. at 776). Based on its reading of *B&S Marketing*, Cash-N-Go concludes that "[i]f the CPD is simply allowed on their own *ipse dixit* to decide to require the full disgorgement of an allegedly violative lender's own monies . . . logic, due process, and equal protection are meaningless."

In response, the Division argues that its restitution order lawfully required Cash-N-Go to disgorge all amounts it would otherwise be precluded from keeping under section 12-314(b)(2) of the MCLL. Section 12-314(b)(2) states that "[a] person may not receive or retain any principal, interest, fees, or other compensation with respect to any loan that is void and unenforceable under this subsection." CL § 12-314(b)(2). The subsection then

defines a "loan that is void and unenforceable" as "[a] loan made in the amount of $25,000 or less" that, among other things, was made without the required license or with a usurious interest rate attached. *See* CL § 12-314(b)(1)(i). Based on these statutes and the ALJ's finding that Cash-N-Go's title pawn transactions were, in actuality, loans subject to Maryland's consumer loan and protection laws, the Division argues that Cash-N-Go's loan transactions are void. Consequently, the Division contends that "any principal, interest, fees, or other compensation" Cash-N-Go earned with respect to its title pawn transactions may be considered in the Division's restitution calculation.[10] We agree.

The purpose of restitution, which has been established and affirmed throughout decades by Maryland's appellate courts, must not be ignored. Dobbs's distinction between damages and restitution bears repeating: while the purpose of the damages remedy is to "compensate the plaintiff" and "pay[] him . . . his losses," the purpose of restitution is "aimed at . . . forcing the defendant to disgorge benefits . . . in the avoidance of unjust enrichment[.]" *Consumer Publ'g*, 304 Md. at 776. We can find no legal authority nor has any been provided for adopting what Cash-N-Go deems the "commonly accepted

---

[10] The Division further argues that, in addition to Cash-N-Go's legal analysis being incorrect, the description of the Division's restitution calculation in Cash-N-Go's appeal is "blatantly false." According to Cash-N-Go, the Division's restitution calculation included amounts for some consumers who never made any payments. However, per Footnote 4 of the Division's Brief:

> The $2,225,823.12 restitution amount ordered by the Agency is based on data compiled by the Division from the Cash-N-Go businesses' records . . ., the accuracy of which Cash-N-Go, Inc. has stipulated to. . . . While it is correct that some of the entries in the data reflect that consumers made no payments to the Cash-N-Go businesses, . . . in totaling the amounts paid to the Cash-N-Go businesses for purposes of calculating its restitution amount, the Agency credited $0 for all entries where a consumer made no payment.

definition" of restitution. The purpose of restitution in the CPA context is to "disgorge benefits it would be unjust for [the violator] to keep." *Id.*

There is similarly no support for Cash-N-Go's contention that *B&S Marketing* establishes that the Division's restitution remedy must be limited to a disgorgement of the interest payments or net proceeds. Under the plain language of the MCLL, "[a] person may not receive or retain any *principal*, interest, fees, or other compensation" with respect to void loans. CL § 12-314(b)(2) (emphasis added). That the Division in *B&S Marketing* chose to order a lesser remedy than what is statutorily permitted did not thereafter bind the Division to ordering the same in this case, particularly given the severity of Cash-N-Go's violations.

In the alternative, Cash-N-Go suggests that, if it was found in violation of the MCLL, it should have been granted an exemption under section 12-316.1. Specifically, Cash-N-Go argues that section 12-316.1 provides that "the principal of a disputed loan transaction could not be forfeited if the alleged violator availed themselves of a 'good faith' exemption." However, the record fails to adequately support this claim made by Cash-N-Go. The statute provides, in pertinent part:

> A licensee . . . exempt from licensing under this subtitle is not subject to a penalty involving the forfeiture of interest or principal for a violation that arises because the licensee . . . exempt from licensing in good faith . . . [p]erformed or omitted to perform an act in conformity with or in reliance upon . . . [a] written opinion by the Commissioner given on request of the licensee . . . exempt from licensing[.]

CL § 12-316.1(a)(1)(ii). Cash-N-Go neither made such a request nor was provided such a written opinion sanctioning its business practices. Furthermore, Cash-N-Go claims that it

35

could rely on the satisfactory reports and absence of state regulatory complaints as evidence that its actions were lawful under Maryland consumer protection laws. This argument fails for two reasons: (1) Cash-N-Go provides no support for its contention that periodic CFR examination reports amount to the type of "written opinion" that might warrant an exemption under section 12-316.1, and (2) the regulatory agencies were not responsible for investigating Cash-N-Go's title pawn activities, thus making any reliance upon their reports unjustified. *See* discussion *supra* Section I.B. Additionally, there is substantial evidence in the record demonstrating that Cash-N-Go was on notice that its title pawn practices were unlawful. The good faith defense "does not limit the imposition of any civil or criminal penalty for a knowing or willful violation of the Consumer Loan Law[] or limit the power of the Commissioner or the courts to order a refund to a borrower of moneys collected in violation of the Consumer Loan Law." Eric C. Surette, Md. Law Encyclopedia, Consumer & Borrower Protection § I.A.11 (citing CL §§ 12-316.1(c)(1)–(2)).

### 2. Civil Penalties

Preliminarily, the Court of Appeals has established that "the grounds . . . for reversing or modifying an adjudicatory administrative decision do not include disproportionality or abuse of discretion." *See Md. Transp. Auth. v. King*, 369 Md. 274, 291 (2002) (citing the Administrative Procedure Act, State Gov. Art. § 10-222(h)). The Court further explained,

> [a]s long as an administrative sanction or decision does not exceed the agency's authority, is not unlawful, and is supported by competent, material and substantial evidence, there can be no judicial reversal or modification of the decision based on disproportionality or abuse of discretion unless, under the facts of a particular case, the disproportionality or abuse of discretion was

so extreme and egregious that the reviewing court can properly deem the decision to be "arbitrary or capricious."

*Md. Transp. Auth.*, 369 Md. at 291.

In setting the civil penalties against Cash-N-Go, the Division considered, in depth, the circumstances surrounding the violations. As a guide, the division relied upon the factors set out in section 13-410(d) of the CPA: (1) the severity of the violation; (2) whether the violation was made in good faith; (3) whether there is a history of prior violations; (4) whether the penalty will adequately deter the violator from repeat offenses; and (5) whether the issuance of a cease-and-desist order, including restitution, would be insufficient to protect consumers. CL § 13-410(d). Acting within its discretion, the Division imposed a fine of $750 for each of the 1,601 title pawn transactions found to be in violation of the CPA (totaling $1,200,750). Notably, the maximum amount that the Division may impose per violation is $10,000. CL § 13-410(a). The circuit court affirmed the Division's final order.

In consideration of the section 13-410(d) factors, we hold that there was substantial evidence to support the Division's imposition of a $750 fine per violation. First, there is substantial evidence that Cash-N-Go's violations were severe. For a span of at least nine years Cash-N-Go provided loans—without the requisite license—to Maryland consumers under the guise of "title pawn" transactions. The company stipulated to the fact that each of its title pawn transactions included a monthly fee of 30% of the principal amount, amounting to 360% annually. This is in stark contrast to the maximum allowable interest rate that a lender may charge under the MIUL, which is 24% or 33%, depending on the

37

unpaid principal amount and unpaid principal balance on the loan. *See* CL §§ 12-306, 12-314. Cash-N-Go failed to adequately and accurately disclose its rates to its consumers. As a result, 1601 consumers, many of whom had approached Cash-N-Go because they were in economic distress, were deceived into paying hundreds and sometimes thousands of dollars more than the principal amount on their loans. Every affidavit that a Cash-N-Go consumer submitted in the administrative proceeding emphasized that, at the time the consumer accepted Cash-N-Go's title pawn service, they understood the transaction to be a loan. In their affidavits, every consumer complained that the terms of their loan were insufficiently explained and that they were unaware that their interest rates were usurious. Consumers were additionally unaware that Cash-N-Go was not licensed to make such loans under Maryland law.

In addition to the unfair and misleading practices mentioned above, Cash-N-Go took security interests in 1155 consumers' vehicles for loans under $700 in value (over 70% of Cash-N-Go's total title loan transactions), in violation of the MCLL. *See* CL § 12-311(c)(1). Over the nine-year span, 147 vehicles were illegally repossessed, often without written notice, when consumers were unable to make the usurious payments. The impact of these practices was severely felt by consumers who relied upon their vehicles to get to their jobs and doctor's appointments, to shop for food and necessities, and to visit friends and relatives.

Second, there is sufficient evidence that Cash-N-Go was not a good faith violator. The evidence shows that Jackson, Cash-N-Go's sole owner and President, engaged in a similar scheme in West Virginia in the 1990s, offering illegal loans to consumers under the

façade of "title pawns." At that time, Jackson and his company, Pawn America, were found to be in violation of consumer protection laws in West Virginia that are comparable to those in Maryland. However, rather than modifying his business practices with consumer protection in mind or ceasing his title pawn scheme altogether, Jackson simply relocated across the border and, by 2007, was offering the same loans to Maryland consumers. As the ALJ duly noted, there is no evidence in the record that Jackson or any other principal Cash-N-Go employee confirmed with the CFR, the Second Hand Precious Metals and Pawnbrokers Unit, or any other division within DLLR that Cash-N-Go was lawfully permitted to provide title loans under its pawnbroker license.

Third, though this is the first time that Cash-N-Go has been charged with violating Maryland consumer protection laws, there is substantial evidence demonstrating a history of disregard for such laws. Notwithstanding the West Virginia violations, the CFR warned Cash-N-Go on multiple occasions that its title pawn practices put the company at risk of violating Maryland consumer lending laws. First, in 2009, a CFR examiner questioned Cash-N-Go's manager about neon signage advertising "title loans" at Cash-N-Go locations. When the manager represented that Cash-N-Go did not offer title loans but, rather, title pawns that were not subject to state consumer protection laws, the examiner took the manager at his word. Nonetheless, the examiner conveyed that the signage needed to be removed or replaced with the accurate term because "title loans are not permitted under the Maryland law as the usury limits restrain car title loans." Cash-N-Go replaced its signage to read "title pawns," but it did not heed the examiner's warning about the underlying transactions and continued to conduct business as usual. Five years later, in

39

2014, the CFR again warned Cash-N-Go that its "pawn" transactions were illegal consumer loans which required additional licensing. Nevertheless, Cash-N-Go continued to offer its title loan services until the Division commenced the investigation giving rise to this litigation.

Finally, there is substantial evidence to conclude that significant penalties are necessary to achieve the desired deterrent effect. Cash-N-Go failed to alter its practices despite multiple warnings from the CFR. Neither did Cash-N-Go terminate or modify its illegal business model after receiving a cease-and-desist order and being charged with civil penalties in West Virginia. There is no evidence to suggest that minimal retribution would sufficiently deter Cash-N-Go from continuing its unlawful practices elsewhere. As such, the issuance of another cease-and-desist order or restitution alone would be insufficient for the protection of consumers.

Accordingly, we hold that there is substantial evidence to establish that the amount that the Division ordered in civil penalties was justified and neither excessive nor arbitrary and capricious.

III. **ANY ERROR MADE BY THE CIRCUIT COURT IN EXCLUDING CASH-N-GO PAWNBROKERS, INC., CASH-N-GO PAWNBROKERS, LLC, AND BRENT JACKSON FROM PARTICIPATING AS PARTIES TO THE PETITION FOR JUDICIAL REVIEW WAS HARMLESS.**

Whether the circuit court erred in finding only Cash-N-Go, Inc. as a party to the petition for judicial review despite the case caption reading "Petition of Cash-N-Go, Inc., *et al.*" is a question of law, which we review de novo. *See Schisler v. State*, 394 Md. 519, 535 (2006); *see also Beall v. Holloway-Johnson*, 446 Md. 48, 76 (2016).

40

Cash-N-Go initially argues that the use of "Cash-N-Go, Inc., *et al.*," in the caption of the petition for judicial review, created a "clear inference" that the petition was on behalf of each of the Cash-N-Go entities and Jackson, all of whom participated in the administrative proceedings. Cash-N-Go further argues that the circuit court's application of Maryland Rule 7-204(a), which governs *responses* to petitions for judicial review rather than the initial petitions themselves, was erroneous. To support its argument, Cash-N-Go relies upon *Colao v. County Council of Prince George's County*, in which this Court explained that "mere technical defects respecting the petition for review will not cause an appeal from an administrative agency to be dismissed if the petitioner has otherwise substantially complied with the procedural rules and there is no prejudice to the respondent." 109 Md. App. 431, 445 (1996). Cash-N-Go claims that the exclusion of the remaining Cash-N-Go entities and Jackson from the petition caption was merely a technical irregularity that should not have resulted in the circuit court eliminating each entity's right to fully participate in judicial review of the Division's order.

The Division responds that the designation "*et al.*" was ambiguous because it did not adequately specify which Cash-N-Go respondents in the administrative action were seeking judicial review of the Division's final order. According to the Division, "merely listing the parties from the administrative caption of a judicial review petition . . . does not establish that the listed parties are in fact seeking judicial review of an agency order." The Division further argues that Cash-N-Go's reliance upon *Colao* is misplaced.

In *Colao*, this Court held that a failure to identify the second of two distinct zoning orders in an otherwise effective petition for judicial review of the first zoning order was

41

more than an excusable technical irregularity. *Id.* at 450–52. This Court thus reversed the circuit court's finding that it had the authority to review the second zoning order despite the petitioner's error. *Id.* The Division argues that Cash-N-Go's failure to identify the other parties to the administrative proceeding as petitioners seeking review is factually similar to the error in *Colao* and distinguishable from cases in which the Court of Appeals identified mere technical irregularities. *See, e.g.*, *Border v. Grooms*, 267 Md. 100, 103–05 (1972) (holding that a timely petition that was served on counsel for the agency instead of the agency itself was a technical error); *Town of Somerset v. Montgomery Cnty. Bd. of Appeals*, 245 Md. 52, 61 (1966) (holding that a timely filed petition in which all parties were listed would not be dismissed simply because the petition failed to explicitly allege that the parties were aggrieved by the agency decision).

It is well-established under Maryland law that "it is the substance of the pleading that governs its outcome, and not its form. . . . [T]he nature of a motion is determined by the relief it seeks and not by its label or caption." *Hill v. Hill*, 118 Md. App. 36, 44 (1997) (citing *Alitalia v. Tornillo*, 320 Md. 192, 195–96 (1990) ("Courts and administrative agencies are expected to look at the substance of the allegations before them, not merely at labels or conclusory averments.")). The Cash-N-Go entities were demonstrably intertwined throughout the administrative hearings below. Many of the court documents preceding Cash-N-Go's petition for judicial review listed all Cash-N-Go entities as individual parties. However, the captions used in the OAH proceedings and ALJ's proposed decision read "Cash-N-Go, Inc., *et al.*" The record therefore suggests that there was little question as to whether all Cash-N-Go entities were involved at each stage of the proceedings. Under these

42

circumstances, we view the use of "*et al.*" in a petition's caption, as a technical irregularity and not a substantive error.

Nevertheless, assuming that the circuit court erred in finding that Cash-N-Go, Inc. was the sole party to the petition for judicial review, such an error had no effect on the proceedings in the circuit court. *See Schneider v. Little*, 206 Md. App. 414, 443 (2012) ("A verdict will not be overturned unless the error was likely to have affected the verdict below; and 'an error that does not affect the outcome of the case is harmless error.'" (quoting *Flores v. Bell*, 398 Md. 27, 33 (2007))). Despite its ruling, the trial court heard and addressed the arguments raised by and related to all Cash-N-Go entities.[11] Hence, any error was harmless.

> **JUDGMENTS OF THE CIRCUIT COURT FOR ALLEGANY COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

---

[11] The Division persuasively argues that the only additional issue that the excluded Cash-N-Go entities might have raised on appeal relates to the Division's finding that Jackson was individually liable. Any argument against Jackson's personal liability would be without merit because the Division "may hold individuals jointly and severally liable for restitution for the [CPA] violations of corporations, when the Division proves that (1) the individual participated directly in or had authority to control the deceptions or misrepresentations, and (2) the individual had knowledge of the practices." *Consumer Prot. Div. v. Morgan*, 387 Md. 125, 176 (2005); *see also MaryCLE, LLC v. First Choice Internet, Inc.*, 166 Md. App. 481, 528 (2006) ("Officers of a corporation may be individually liable for wrongdoing that is based on their decisions. . . If an officer either specifically directed, or actively participated or cooperated in the corporation's tort, personal liability may be imposed." (quoting *T-Up, Inc. v. Consumer Prot. Div.*, 145 Md. App. 27, 72–73 (2002), *cert denied*, 369 Md. 661)). There is substantial evidence in the record to show that Jackson, as the President and sole owner of Cash-N-Go, had the authority to control the company's title pawn business model. He testified himself, "I'm Cash-N-Go." Furthermore, one of Cash-N-Go's general managers repeatedly testified that any decisions concerning business operations were made or approved by Jackson.